[No. A046622. First Dist., Div. Two. Nov. 14, 1990.]

ERNEST M. SMITH et al., Cross-complainants and Appellants, v. CITY AND COUNTY OF SAN FRANCISCO, Cross-defendant and Respondent.

**COUNSEL**

Burton, Brunt & Robbins and Thomas M. Burton for Cross-complainants and Appellants.

Louise H. Renne, City Attorney, and Andrew W. Schwartz, Deputy City Attorney, for Cross-defendant and Respondent.

## OPINION

**BENSON, J.**—Ernest and Alice Smith appeal from the judgment entered after the trial court sustained a demurrer to their second amended cross-complaint without leave to amend. Appellants attempted to state causes of action against the City and County of San Francisco (the City) for inverse condemnation, promissory estoppel, breach of the covenant of good faith and fair dealing, negligence, breach of fiduciary duty, civil rights violations, and breach of oral contract. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

On March 18, 1983, the City filed a complaint in eminent domain against appellants and other parties. It sought to acquire property for park and open space use. Appellants cross-complained against numerous parties, including the City, for inverse condemnation, fraud, interference with prospective economic advantage, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, deprivation of constitutional rights, mandamus, and injunction. The court sustained the City's demurrer to all but the inverse condemnation cause of action, allowing 20 days to amend. The court also severed and stayed the cross-complaint.

After trial began in the City's eminent domain action, the parties settled that case in May 1985. Under the settlement, the City agreed to pay $307,500 for appellants' three lots and portion of a fourth which had been the subject of the eminent domain action (the upper lots).

Appellants filed a verified first amended cross-complaint asserting various causes of action. The court sustained the City's demurrer to all causes of action with leave to amend.

The Smiths then filed a second amended cross-complaint, which is the subject of this appeal. The relevant factual allegations are as follows:

"5. In 1954, the Smiths had acquired one acre of a wooded hillside with a view of the Pacific Ocean for future development as a retirement resource . . . .

"6. In June 1975, the Smiths asked the City for assistance in developing their land. The City at that time formulated a scheme to keep the Smith's [*sic*] land in an undeveloped state tantamount to open space without the necessity and cost of acquisition. In pursuit of this secret scheme, the City decided to encourage the Smiths to engage in multiple plans for development of their land which plans would, however, be manipulated by the City

so as always to require further submittals, amendments, information, and other compliance measures necessitating time, effort and expense. The City knew that the Smiths were a retired couple of limited means attempting to develope [sic] their land without professional assistance. In furtherance of the City's secret scheme to stop any development on the Smith land, the City embarked upon its scheme to cause the Smiths to exhaust their resources and time in fruitless development efforts, all for the purpose of keeping the land in its undeveloped state.

"7. The City first recommended that the Smiths and adjacent landowners develop their mutual lands as a nineteen unit subdivision which, however, depended upon access rights available only for a limited time through still farther adjacent property. The City thwarted the nineteen unit development by requiring an unjustified Environmental Impact Report which the City knew would delay the project until the access rights were lost.

"8. Next, the City suggested a nine unit planned unit development (PUD) . . . . After spending two years preparing and submitting numerous plans and meeting all requirements, the City, on June 27, 1980, suddenly designated the Smith land as open space so as to buffer a large apartment complex proposed by a member of the Citizens' Housing Task Force appointed by the City's mayor.

"9. Over a year later, the City, having taken no steps to acquire the Smiths' property and based upon the City's advice to the Smiths that their land would be deleted from the master plan open space designation, the Smiths signed an option to sell the entire acre for $810,000.

"10. Without notice to the Smiths, the City then abruptly amended the open space designation to delete only the Smiths' lower three lots fronting on Kensington Way, while retaining the upper three lots within the open space designation.

"11. The City then offered the Smiths $85,000 for their one-half acre of forested land consisting of 5 regulation sized lots or three oversized lots with a view of the Pacific Ocean. The City's in-house appraisal was $75,000 per lot. Its outside appraisal was $500,000 for the entire half-acre parcel.

"12. In January, 1985 the City offered to buy lot 17 adjacent to the Smiths' land and only one third its size for $109,000 but only raised its offer to the Smiths to $141,900.

"   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"14. The City had promised and was required by law to negotiate in good faith with the Smiths, but nevertheless refused to do so from 1981 until it raised its offer at the beginning of the condemnation trial in 1985, and finally settled the acquisition by agreeing to pay the Smiths $307,500.

"15. Under the terms of the settlement of the eminent domain action, the Smiths were to retain their three buildable lots below fronting on Kensington Way which the City had never purported to take. Nevertheless, the City prepared a deed for the Smiths' signature conveying land in excess of the agreed settlement, and which would deprive the Smiths of one of their three lots below. Not until after further judicial hearings and six months after the agreed settlement, did the City pay the Smiths the agreed purchase price for their lots.

"16. Notwithstanding the terms of the settlement and the revision of the deed conveying only so much of the upper lots to the City as would leave the Smiths three buildable lots below, the City still maintained that, although the area of the three lots below was sufficient for development, the lots were still unbuildable because of set-back requirements. Accordingly, not since the settlement of the condemnation action in March, 1985, have the Smiths been able to develop their lower three lots because of technical objections by the City as to lot description and set-back requirements."

The City then demurred for a third time to appellants' cross-complaint. On March 14, 1989, the court sustained the demurrer without leave to amend. Appellants filed a timely notice of appeal from the judgment subsequently entered in favor of the City.

DISCUSSION

1. *Inverse Condemnation*

Incorporating the factual allegations set forth above, appellants' inverse condemnation cause of action further alleges that:

"18. From and after 1975 the City has taken and damaged the Smiths' real property interests by its administrative scheme to keep the property undeveloped, from 1980 and thereafter, by its announcements and activities making known its intent and desire to acquire the Smith property for use as a park, and from 1985 by its efforts to thwart even the development of the land not subject to the eminent domain proceeding, solely to discourage the Smiths from further development and from pursuing their cross-complaint.

"19. The conduct of the City toward the Smiths in attempting to keep their land in an undeveloped state, by making an unnegotiable and

inadequate offer for the purchase of the land, and by placing formidable obstacles in the Smiths' path in the use of their land, has been unreasonable and oppressive, and has resulted in a legal restraint of the use of the Smith property so as to constitute a taking of said property which has proximately and irreparably damaged the Smiths."

The courts recognize two forms of compensable inverse condemnation which may apply in this case: (1) excessive regulation which denies the owner all economic use of the property (see *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378]; *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266 [157 Cal.Rptr. 372, 598 P.2d 25], affd. (1980) 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138], revd. on other grounds in *First Lutheran Church, supra*); and (2) improper precondemnation conduct causing a diminution in the property's market value. (See *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39, 52 [104 Cal.Rptr. 1, 500 P.2d 1345].) Since appellants do not clearly identify which theory they rely upon, we will determine whether the second amended complaint states a cause of action for either form of inverse condemnation.

## A. *Regulatory Taking*

■ To state a cause of action for inverse condemnation based on government regulation amounting to a constitutional taking, appellants must allege facts showing such regulation deprived them of substantially all use of their property. (*Terminals Equipment Co.* v. *City and County of San Francisco* (1990) 221 Cal.App.3d 234, 242-244 [270 Cal.Rptr. 329] [demurrer properly sustained where face of complaint established no deprivation of all reasonable use of property]; *Guinnane* v. *City and County of San Francisco* (1987) 197 Cal.App.3d 862, 868 [241 Cal.Rptr. 787] [plaintiff could not contend he had been denied all use of his property]; *Pan Pacific Properties, Inc.* v. *County of Santa Cruz* (1978) 81 Cal.App.3d 244, 256 [146 Cal.Rptr. 428] [demurrer sustained where no facts alleged showing plaintiffs deprived of all reasonable use of property]; *Sierra Terreno* v. *Tahoe Regional Planning Agency* (1978) 79 Cal.App.3d 439, 442-443 [144 Cal.Rptr. 776] [demurrer sustained where allegations conceded value remained in property]; *Pinheiro* v. *County of Marin* (1976) 60 Cal.App.3d 323, 328-329 [131 Cal.Rptr. 633] [demurrer properly sustained without leave to amend where no allegations property lacked any remaining reasonably beneficial use].)

Appellants' second amended cross-complaint does not allege the City's regulation of their lower three lots deprived them of substantially all value

and use of that property.[1] They allege that despite the City's allegedly wrongful conduct (in requiring an environmental impact report and temporarily designating the lots as open space in the general plan) they still obtained an option to sell their land, including the lower three lots, for $810,000. The lots thus retained significant value. Appellants also allege that development of the lower three lots has not taken place because the City has asserted technical objections concerning lot description and set-back requirements. However, appellants do not claim the City's actions in this regard have precluded substantially all development or use of the lots. In fact, they allege the area of the three lots is sufficient for development. A dispute over lot description and set-back requirements on lots large enough for development does not constitute a deprivation of substantially all use of the property.

Moreover, a prerequisite to asserting a regulatory taking claim "is a final and authoritative determination of the type and intensity of development legally permitted on the subject property." (*MacDonald, Sommer & Frates* v. *Yolo County* (1986) 477 U.S. 340, 348 [91 L.Ed.2d 285, 294, 106 S.Ct. 2561].) "Until a property owner has 'obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property,' 'it is impossible to tell whether the land retain[s] any reasonable beneficial use or whether [existing] expectation interests ha[ve] been destroyed.'" (*MacDonald, Sommer & Frates, supra,* at p. 349 [91 L.Ed.2d at p. 294], citing *Williamson Planning Comm'n* v. *Hamilton Bank* (1985) 473 U.S. 172, 186, 190, fn. 11 [87 L.Ed.2d 126, 138-139, 140-141, 105 S.Ct. 3108]; see *Guinnane* v. *City and County of San Francisco, supra,* 197 Cal.App.3d at pp. 868-869 [where record did not show city had taken any final action on plaintiff's application for a building permit, plaintiff's assertion he had been denied the right to develop the property was premature and he could not allege and prove a taking of the property].)

The allegations here demonstrate no such final determination of the legally permitted use of appellants' lower three lots. To the contrary, the dispute over lot descriptions and set-back requirements indicates the situation remains in flux and the permitted use of the property has not been finally decided. The cross-complaint thus does not state a ripe claim for regulatory taking.

### B. *Unreasonable Precondemnation Activities*

■ Under *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, a landowner may recover inverse condemnation damages for unreasonable precondem-

---

[1] Appellants acknowledge they have been compensated for the City's express taking of their upper three lots by their sale of those lots to the City for $307,500. They cannot logically assert an inverse condemnation cause of action based on a regulatory taking for land already acquired by the City in settlement of the eminent domain action.

nation activities. Such relief is available where the condemnee can demonstrate "(1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (*Id.* at p. 52.)

Here, appellants fail to allege facts establishing the City's conduct diminished the value of their property. The only allegations concerning value are that appellants at one point obtained an $810,000 option to sell all six lots and later sold their upper three lots for $307,500 to settle the eminent domain action. Such allegations do not, however, demonstrate that any of the lots declined in market value because of the City's conduct.

██ *Klopping* damages for unreasonable precondemnation conduct would also be unavailable in regard to the lower three lots because the City never took any action to condemn that property. (See *Frisco Land & Mining Co.* v. *State of California* (1977) 74 Cal.App.3d 736, 757 [141 Cal.Rptr. 820] [*Klopping* inapplicable where the state had only imposed new restrictions and had not taken action to condemn the property]; see also *Guinnane* v. *City and County of San Francisco, supra,* 197 Cal.App.3d at pp. 866-867 [including property in recreation and open space element of general plan does not amount to an announced intention to condemn justifying an action in inverse condemnation].) By definition, damages for improper precondemnation conduct require that the property be condemned.[2]

Appellants thus fail to state a cause of action for unreasonable precondemnation activity.

2. *Promissory Estoppel*

Appellants allege the City promised to treat fairly, on their merits and with dispatch, their applications for development and later promised to buy the upper three lots for fair market value, leaving three buildable lots below. Appellants "justifiably and reasonably relied upon the City's promises to act favorably on the Smiths plans and applications submitted in response to the City's directions, and to act with dispatch and to pay the Smiths' the fair market value of their land once the City had designated it as open space." Appellants allege the City breached its promises by thwarting their

---

[2]The upper three lots, unlike the lower lots, were condemned. However, appellants were required to seek *Klopping* damages for those lots in the City's eminent domain action (*Klopping* v. *City of Whittier, supra,* 8 Cal.3d at p. 58), which they settled by accepting $307,500 for the property.

development efforts and by "devaluing their land once the City elected to condemn it."

While labeling this cause of action "Breach of Contract," appellants in fact attempt to state a cause of action for promissory estoppel. ■ Section 90, subdivision (1) of the Restatement Second of Contracts provides that, "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." California recognizes the doctrine of promissory estoppel. "Under this doctrine a promisor is bound when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his promise, if injustice can be avoided only by its enforcement." (*Youngman* v. *Nevada Irrigation Dist.* (1969) 70 Cal.2d 240, 249 [74 Cal.Rptr. 398, 449 P.2d 462]; *Signal Hill Aviation Co.* v. *Stroppe* (1979) 96 Cal.App.3d 627, 637 [158 Cal.Rptr. 178].)

■ The party claiming estoppel must specifically plead all facts relied on to establish its elements. (Cf. *Del Paso Recreation & Park Dist.* v. *Board of Supervisors* (1973) 33 Cal.App.3d 483, 501 [109 Cal.Rptr. 169]; *Frank Pisano & Associates* v. *Taggart* (1972) 29 Cal.App.3d 1, 18 [105 Cal.Rptr. 414] [equitable estoppel].) One essential element is detrimental reliance by the promisee. (*Youngman* v. *Nevada Irrigation Dist.*, *supra*, 70 Cal.2d at pp. 249-250.) However, other than their conclusory allegation that they reasonably and justifiably relied on the City's promises, appellants allege no facts demonstrating such reliance. No facts are alleged which show that appellants changed their position in any way because of what they had been promised by the City. Having failed to allege any facts demonstrating reliance, appellants do not state a cause of action for promissory estoppel.

3. *Breach of Implied Covenant of Good Faith and Fair Dealing*

Appellants attempt to state a cause of action for tortious breach of the implied covenant of good faith and fair dealing. They allege that, "Inhering in the promises made by the City to the Smiths and in the contract between the Smiths and the City was an implied covenant of good faith and fair dealing to treat the Smiths fairly in fulfilling the promises and in the performance of the contract." The City allegedly breached that covenant by thwarting the Smiths' efforts to develop their land and by inducing them to rely on promises the City had no intention of keeping. As a result, appellants allegedly suffered "mental, emotional and physical distress and anxiety . . . ."

The prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract. (See *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 683-684, 690 [254 Cal.Rptr. 211, 765 P.2d 373]; *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 577 [108 Cal.Rptr. 480, 510 P.2d 1032] [since noninsurer defendants in bad faith case were not parties to the insurance contracts, they were not subject to an implied duty of good faith and fair dealing].) Here, the gist of the allegations is that the parties are in the relationship of real estate developers to government land use regulators, and not in a contractual relationship. Without a contractual relationship, appellants cannot state a cause of action for breach of the implied covenant.

Moreover, even if there were a contractual relationship between the parties, appellants have pled no facts establishing a "special relationship" between them which could justify extending tort liability for bad faith to the present context. (See *Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d at pp. 692-693 [relationship of employee to employer is not a special relationship akin to that between insured and insurer warranting recognition of tort liability for bad faith].) No California court has ever recognized such a cause of action in the context of the relationship between real estate developers and local land use regulators.

Appellants argue the implied covenant can exist based on certain statutory duties imposed on the City. They offer no authority for such a proposition and we have found none. To the contrary, the covenant of good faith and fair dealing is, by definition, an implied contract term. It has no relation to any statutory duties which may exist.

Appellants also seem to contend the implied covenant may derive from the City's alleged promises which form the basis of their claim of promissory estoppel. No authority supports this argument. The courts have recognized that the implied covenant imposes reciprocal duties of good faith and fair dealing on both parties to a contract. (*Commercial Union Assurance Companies* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912, 918 [164 Cal.Rptr. 709, 610 P.2d 1038].) Promissory estoppel, on the other hand, is a unilateral promise based not on consideration but on another party's detrimental reliance, with no reciprocal duties on the part of the promisee. We are unwilling to impose a unilateral duty of good faith on the promissor where there is no actual or implied contract between the parties. Moreover, we have previously found appellants failed even to state a cause of action for promissory estoppel.

Appellants thus fail to state a cause of action for breach of the implied covenant of good faith and fair dealing.

### 4. *Negligence/Special Relationship*

■ Appellants also attempt to state causes of action for negligence and "breach of special relationship." They allege the City owed them a duty to perform its administrative functions reasonably, accurately, honestly, fairly, openly, and professionally. Appellants concede the City had no duty to grant their development applications. However, the City allegedly breached its duty "by allowing considerations unrelated to the merits of the Smiths' proposals to influence and determine its decisions regarding both the Smiths' land and the Smiths themselves." Appellants further allege "the City treated the Smiths arbitrarily and in a manner different that [*sic*] they would have treated a professional developer having the same development objectives with respect to the same land."

As for the existence of a special relationship, appellants allege that "[b]y virtue of the Smiths' age and inexperience, the City was able to induce and cultivate an inordinate reliance by the Smiths upon the credibility and good faith of the City so that there arose on the part of the Smiths a special relationship of trust of which the City was well aware." Appellants conclude that the City took advantage of the special relationship "by abusing the Smiths' confidence to their detriment . . . ."

The existence of a duty is a question of law and a complaint lacking facts establishing a duty is fatally defective. (*Peter W.* v. *San Francisco Unified Sch. Dist.* (1976) 60 Cal.App.3d 814, 821-822 [131 Cal.Rptr. 854].) "There is a legal duty on any given set of facts only if the court or the Legislature says there is a duty." (*Amaya* v. *Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295, 309 [29 Cal.Rptr. 33, 379 P.2d 513] [italics omitted], overruled on other grounds in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].)

Appellants first argue that the duties allegedly owed by the City arise from Government Code[3] sections 3601 and 7267.1, subdivision (a). However, section 3601 was repealed in 1981 (Stats. 1981, ch. 160, § 4) and thus cannot provide the basis for any duty on the part of the City. Moreover, even if section 3601 had not been repealed, it did not purport to impose a tort duty on government agencies. Included in the Moscone Governmental Conflict of Interests and Disclosure Act, section 3601 merely stated findings, including that referred to by appellants, that the Legislature enacted the division in part "To assure the independence, impartiality and honesty of public officials in governmental actions and decisions . . . ." (§ 3601,

---

[3] Unless otherwise noted, all statutory references are to the Government Code.

subd. 1.) Appellants offer no authority holding that this legislative finding created a tort duty on the part of local governments.

Section 7267.1, subdivision (a) provides that, "The public entity shall make every reasonable effort to acquire expeditiously real property by negotiation." Appellants cite no authority holding that section 7267.1 creates a tort duty. To the contrary, section 7274 expressly provides that "Sections 7267 to 7267.7, inclusive, create no rights or liabilities and shall not affect the validity of any property acquisitions by purchase or condemnation." (See also § 7267 ["public entities shall, *to the greatest extent practicable*, be *guided* by the provisions of Sections 7267.1 to 7267.7 . . . ." (italics added)]; § 7270 ["Nothing contained in this chapter shall be construed as creating in any condemnation proceedings brought under the power of eminent domain any element of damages not in existence on the date of enactment of this chapter"]; *Toso* v. *City of Santa Barbara* (1980) 101 Cal.App.3d 934, 958 [162 Cal.Rptr. 210] [failure to comply with the guidelines for land acquisitions stated in § 7267 does not create a cause of action]; *Taper* v. *City of Long Beach* (1982) 129 Cal.App.3d 590, 594-595, fn. 1 [181 Cal.Rptr. 169] [violation of § 7267 et seq. does not give rise in and of itself to a separate cause of action or a right to damages not already recognized].) Section 7267.1 thus does not establish a general tort duty on the part of a local government.

The only other source of such a duty identified by appellants is the "special relationship" they allegedly enjoyed with the City. Conceding that "[t]ypically, a special relationship does not exist between a governmental agency and the public generally," appellants nevertheless argue they were in a special relationship with the City because it had voluntarily assumed a protective duty toward the Smiths.

"A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act." (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137].) Thus, "when the state, through its agents, voluntarily assumes a protective duty toward a certain member of the public and undertakes action on behalf of that member, thereby inducing reliance, it is held to the same standard of care as a private person or organization." (*Id.* at p. 24.)

The second amended cross-complaint does not allege actions undertaken by the City demonstrating it assumed any protective duty toward the Smiths. To the contrary, appellants allege a series of actions by the City best described as consistently adverse to the Smiths' desire to develop their property. Appellants aptly summarize those allegations by stating that the

City attempted to keep their land in an undeveloped state, made an unnegotiable and unreasonable offer to purchase the upper three lots, and placed formidable obstacles in the Smiths' path in the use of their land. Appellants thus allege no actions undertaken on their behalf by the City which could be construed as assuming a special duty to protect appellants' interests.

Appellants also allege that beginning sometime after June 1975, the City promised to treat their applications to develop the property "fairly, on their merits, and with dispatch . . . and later, promised to purchase the upper portion of the Smith land at its fair market value, leaving the Smiths with three buildable lots below." However, such promises are simply assurances the City's planning authorities would treat appellants as they would any other members of the general public who submitted applications for development or whose land was the target of acquisition for public use. Obviously, all applications for development should be considered with dispatch and on their merits. A promise to do so does not imply the City was undertaking any special protection of appellants during the application process.

Similarly, since the City was obligated by law to purchase the upper three lots (like all property acquired through eminent domain) at fair market value (Code Civ. Proc., § 1263.310), a promise to do so cannot amount to assumption of a protective duty toward appellants. Finally, the City's promise to leave appellants three "buildable" lots was made in connection with the settlement of the eminent domain litigation. This arm's length agreement to settle contested litigation cannot create a special relationship. Thus, the City's alleged promises cannot have induced appellants to believe the City had voluntarily assumed tort duties, particularly when considered in light of the City's other actions.

Appellants offer no authority for the existence of a special relationship between local land use regulators and citizens seeking to develop their property, and we have found none. Moreover, the cases relied upon are all distinguishable, either because the court found no special relationship (*Williams v. State of California, supra,* 34 Cal.3d at p. 27 [no duty established where highway patrol officer merely arrived after accident and assumed responsibility over the investigation]; *Bonds v. State of California* ex rel. *Cal. Highway Patrol* (1982) 138 Cal.App.3d 314, 318-320 [187 Cal.Rptr. 792] [no special relationship where nothing in the actions of the highway patrol could have caused the plaintiff to rely on California Highway Patrol (CHP) protection]; *Morgan v. County of Yuba* (1964) 230 Cal.App.2d 938, 944 [41 Cal.Rptr. 508] [while police officer had promised to warn of release of prisoner who had threatened to kill the victim, reliance on the promise not pleaded]), or the special relationship arose based on protective conduct undertaken on behalf of the injured party or on conduct which created or

increased the risk of harm (*Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 805 [205 Cal.Rptr. 842, 685 P.2d 1193] [in light of prior violent acts, college undertook to patrol stairway and parking lot where plaintiff assaulted; liability also based on maintenance of dangerous premises under § 835]; *Johnson* v. *State of California* (1968) 69 Cal.2d 782, 785-786 [73 Cal.Rptr. 240, 447 P.2d 352] [state increased risk of harm by placing youth with homicidal tendencies in foster home without warnings]; *Mann* v. *State of California* (1977) 70 Cal.App.3d 773 [139 Cal.Rptr. 82] [CHP conduct in leaving scene of accident contributed to and increased risk that would otherwise have existed]), or was based on a preexisting special relationship between the parties (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 436 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166] [psychotherapist-patient relationship]).[4]

Having failed to establish the existence of a tort duty, either statutory or based on a special relationship, the second amended cross-complaint fails to state causes of action for either negligence or breach of special relationship.

*5. Violation of Civil Rights*

■ Appellants also attempt to state a cause of action for violation of their civil rights under 42 United States Code section 1983 and the Fourteenth Amendment to the federal Constitution. Specifically, they allege "[t]he City discriminated in its administrative functions and determinations against the Smiths because of their age and inexperience in violation of the equal protection clause . . ." and that "[t]he City deprived the Smiths of the use and enjoyment of their real property without the payment of just compensation in violation of the due process and 'taking' clauses governed by the Fourteenth Amendment."

Appellants' claim of an unconstitutional taking without just compensation is identical to their cause of action for inverse condemnation. While it is true such a cause of action can be brought under 42 United States Code section 1983 in order to invoke federal jurisdiction (*Lake Country Estates* v. *Tahoe Planning Agcy.* (1979) 440 U.S. 391, 399-400 [59 L.Ed.2d 401, 408-410, 99 S.Ct. 1171]), section 1983 does not alter the elements which must be pled to state a cause of action for an unconstitutional taking.[5] Thus, for the

---

[4]*Clemente* v. *State of California* (1980) 101 Cal.App.3d 374 [161 Cal.Rptr. 799], also relied upon by appellants, was criticized and overruled by the supreme court in *Williams* v. *State of California, supra,* 34 Cal.3d at pages 26, 28, footnote 9.

[5]42 United States Code section 1983 provides that, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution

reasons stated above regarding inverse condemnation, appellants fail to state a cause of action under section 1983 for the alleged taking.

■ In the most general of terms, appellants allege the City's conduct also denied them substantive due process and equal protection. However, these claims (like appellants' inverse condemnation claim, discussed above) are subject to the same ripeness standards applied generally to constitutional challenges of land use regulation. (*Williamson Planning Comm'n* v. *Hamilton Bank, supra*, 473 U.S. at pp. 199-200 [87 L.Ed.2d at pp. 146-148] [where application of various zoning regulations claimed to constitute a taking, even if analyzed as a due process claim it was premature since no final decision had been made as to how the regulations would be applied to the property]; *Kinzli* v. *City of Santa Cruz* (9th Cir. 1987) 818 F.2d 1449, 1455-1456 [where claimed that zoning ordinance as applied amounted to a taking and denied substantive due process and equal protection, all claims premature since no final decision on the type and intensity of allowed development]; *St. Clair* v. *City of Chico* (9th Cir. 1989) 880 F.2d 199, 202-204 [where alleged that city's refusal to permit construction amounted to a taking and denied due process and equal protection, all claims premature since no final determination of permitted uses].) Since a final determination is a condition precedent to maintaining a constitutional challenge to land use regulation, the issue may appropriately be reached on demurrer. (Cf. *Tahoe-Sierra Preservation Council* v. *State Water Resources Control Bd.* (1989) 210 Cal.App.3d 1421, 1443-1444 [259 Cal.Rptr. 132] [taking claim found not ripe on motion for judgment on the pleadings]; *Carroll* v. *City of Prattville* (M.D.Ala. 1987) 653 F.Supp. 933, 942 [taking claim found unripe on motion to dismiss under Fed. Rules Civ.Proc., rule 12(b)(6)].)

As discussed above, appellants fail to allege any final determination of the legally permitted use of the property they seek to develop. While they allege they have been unable to develop their property "because of technical objections by the City as to lot description and set-back requirements," they do not allege they have submitted a development plan, that the City has conclusively denied such a plan, or that they have applied for and been denied a variance. The allegations in fact indicate the legally permitted uses of the property have not been finally determined. Thus, as with their inverse condemnation claim, appellants fail to state ripe claims for denial of due process or equal protection.

## 6. Breach of Oral Contract

Finally, appellants allege that a term of their settlement of the eminent domain action was the City's promise that they would retain three

---

and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

"buildable" lots. Appellants allege that since the settlement in March 1985, the City has breached that oral agreement by preventing them from developing the three lower lots by initially providing a deed which inaccurately described the property (but was later corrected) and by raising set-back and other requirements.

■ The precise nature of the City's alleged promise regarding "buildable" lots is unclear. It appears appellants are alleging the City promised to forgo application of its zoning and/or building code requirements to the lower three lots to allow development. However, land use regulation is an exercise of the state's police powers. (*Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 800 [132 Cal.Rptr. 386, 553 P.2d 546]; *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 159 [130 Cal.Rptr. 465, 550 P.2d 1001].) It is settled that the government may not contract away its right to exercise that police power in the future. (*Avco Community Developers, Inc., supra,* 17 Cal.3d at p. 800; see *Caminetti* v. *Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 344, 362 [139 P.2d 908]; *Laurel Hill Cemetery* v. *City and County* (1907) 152 Cal. 464, 475 [93 P. 70], affd. 216 U.S. 358 [54 L.Ed. 515, 30 S.Ct. 301].) Thus, any alleged agreement to permit development without application of land use regulations would be invalid and unenforceable as contrary to public policy. (*Avco Community Developers, Inc., supra,* at p. 800.)

If appellants are alleging the City promised to leave them lots of sufficient size to permit development subject to applicable land use and building code regulation, the facts alleged do not demonstrate a breach of that promise. The allegations do not show the City has in any manner rendered the lots permanently "unbuildable." They merely indicate the City has applied its land use regulations pursuant to its police powers, and that the property has not yet been developed because of an apparent dispute over set-back and other requirements.

Appellants thus fail to state a cause of action for breach of oral contract.

DISPOSITION

Appellants do not suggest any facts they could allege which would remedy the defects discussed above. To the contrary, they ask that we reverse to allow them to proceed with their action "as pleaded." After three attempts, appellants have still failed to state a cause of action against the City. The demurrer was therefore properly sustained without leave to amend. (*Pinheiro* v. *County of Marin, supra,* 60 Cal.App.3d at pp. 328-329.)

The judgment is affirmed.

Smith, Acting P. J., and Peterson, J., concurred.