[Civ. No. 52357. Second Dist., Div. Five. Mar. 21, 1979.]

KAISER FOUNDATION HOSPITALS et al.,
Plaintiffs and Respondents, v.
NORTH STAR REINSURANCE CORPORATION,
Defendant and Appellant.

## COUNSEL

James J. Duryea and Timothy J. Hogan for Defendant and Appellant.

Thelen, Marrin, Johnson & Bridges, Robert B. Flaig and John D. Merrill for Plaintiffs and Respondents.

## OPINION

**KAUS, P. J.**—Defendant North Star Reinsurance Corporation (North Star) appeals from a judgment in favor of plaintiffs Kaiser Foundation Hospital, et al., (Kaiser) and against North Star in the amount of $59,168.25.

### FACTS

In 1963 certain of the underwriters at Lloyd's, London (Lloyd's) issued three insurance policies to Kaiser. Together they provided liability coverage for personal injury, property damage, and medical malpractice with limits of $200,000 per person, $1 million per occurrence and $1 million aggregate per year, all subject to a deductible of $25,000 per claim. The policy[1] was renewed annually and was in effect for the period of April 9, 1965 to April 9, 1966, and several years thereafter. It provided that it applied "only to malpractice or occurrences occurring or alleged to have occurred during the Certificate period . . . ."

In 1965 Kaiser determined that excess insurance was desirable and obtained from North Star an excess comprehensive liability policy with limits of $400,000 per person, $2 million per occurrence and $2 million aggregate. Pursuant to an extension agreement the North Star policy was in effect through April 9, 1966.

Eventually payment was made on 14 malpractice claims which Kaiser allocated to the April 1965–April 1966 policy year.[2] The first 13 of these were settled with Lloyd's concurring in Kaiser's allocation of the date of

---

[1]Although, as noted, there were three Lloyd's policies, the parties agree that for practical purposes they may be treated as one.

[2]We are only concerned with payments which exceeded Kaiser's $25,000 deductible.

loss and paying a total of $859,168.25[3] The 14th claim was settled by Kaiser in 1973 for $350,000; of this sum Lloyd's paid $140,831.75, North Star $125,000, and Kaiser $84,168.25.

The division of payments under which Kaiser paid $59,168.25 more than its deductible reflects the dispute which gave rise to this litigation: Lloyd's refused to pay its "per person" limit of $200,000 because the payment of $140,831.75 exhausted its $1 million aggregate limit for 1965-1966. North Star claimed, however, that the only reason the limit was exhausted was that Lloyd's had joined with Kaiser in wrongly allocating certain losses to the 1965-1966 policy year.

Kaiser then started this action to recover its excess payment of $59,168.25, to which action North Star cross-complained against Kaiser and Lloyds, charging them with negligently and fraudulently assigning dates of loss on malpractice claims to policy years other than those in which the losses in fact occurred, thereby wrongfully attempting to call North Star's excess insurance into play. North Star reasoned that had the losses been allocated to their proper policy years, Lloyd's would have paid at least $59,168.25 less with respect to claims assigned to the April 1965 to April 1966 period; thus when the 14th claim was to be paid, Lloyd's would have been able to pay its full $200,000 "per person" limit, obviating any question of North Star's liability for more than the amount it in fact paid—$125,000.

At the outset of the trial Kaiser moved to exclude any evidence which would "contest any dates of occurrence of claims," except those to which North Star had made a financial contribution. This *in limine* motion was granted, the court ruling that "any evidence attempting to contest dates of

| [3] Claimant: | Total Payment | Paid By Lloyd's | Paid By North Star | Date Of Payment |
|---|---|---|---|---|
| 1. Morris | 300,000 | 200,000 | 75,000 | 4/29/68 |
| 2. Hosmer | 60,000 | 35,227.25 | –0– | 3/27/68 |
| 3. Yaksich | 250,000 | 200,000 | 25,000 | 10/7/66 |
| 4. Conreaux | 45,000 | 8,333 | –0– | 9/25/67 |
| 5. Dollinger | 32,088 | 7,088 | –0– | 12/21/67 |
| 6. Huber | 85,000 | 60,000 | –0– | 12/8/69 |
| 7. Jarecki | 100,000 | 75,000 | –0– | 7/10/70 |
| 8. Showalter | 50,000 | 25,000 | –0– | 5/14/70 |
| 9. Segura | 40,000 | 15,000 | –0– | 8/12/70 |
| 10. Reckelhoff | 50,000 | 25,000 | –0– | 2/18/71 |
| 11. Rifkin | 95,000 | 55,020 | –0– | 4/26/67 |
| 12. Rucker | 75,000 | 50,000 | –0– | 12/12/69 |
| 13. Barrett | 128,500 | 103,500 | –0– | 10/23/72 |
| Totals | $1,310,588 | $859,168.25 | $100,000 | |

loss established by [Kaiser] and agreed to by Lloyd's on which defendant North Star Reinsurance Corporation neither paid any monies nor was asked to pay any monies is excluded; . . ." Since during the course of the argument North Star had indicated that it intended to contest only three of the twelve claims to which it had not contributed, the court's order then fixed the dates of loss as to those three claims as coming within the 1965-1966 policy year. North Star was then permitted to dismiss its cross-complaint without prejudice.

The three claims in question are those identified in footnote 3, *ante,* as the Barrett, Conreaux and Rifkin claims. North Star's contentions with respect to the latter two are somewhat obscure.[4] That criticism, however, cannot be levied against North Star's assertions with respect to the handling of the Barrett claim, which resulted in a charge against Lloyd's 1965-1966 exposure of $103,500—more than adequate to cover the $59,168.25, on which this lawsuit turns.

With respect to the Barrett claim North Star made two complementary offers of proof: (1) the claim involved alleged malpractice in several policy years, 1965 through 1969, which culminated in the amputation of one of the claimant's legs in 1969; (2) in other cases where the negligent acts were spread over a number of policy years, Kaiser and Lloyd's had customarily prorated the loss to the several years involved.[5] The legal premise of Kaiser's successful motion to preclude North Star from proving its contentions is and was, bluntly, that it is none of North Star's business how Kaiser and Lloyd's allocate losses as far as policy periods are concerned.[6] In addition Kaiser claims that even if the trial court had not granted Kaiser's motion to preclude North Star from offering evidence concerning the correct dates of loss, the same judgment would have resulted.

[4]North Star asserts that on the Conreaux and Rifkin claims, Kaiser should have been charged with two deductibles. Had that been done, Lloyd's contribution would have been $50,000 less.

[5]We note in passing that neither party quarrels with the basic proposition that—absent peculiar policy language—the relevant policy period is the one in which the claimant was actually damaged by reason of malpractice, rather than the period in which the malpractice was committed. (See generally: *Insurance Co. of North America* v. *Sam Harris Constr. Co.* (1978) 22 Cal.3d 409 [149 Cal.Rptr. 292, 583 P.2d 1335]; *Maples* v. *Aetna Cas. & Surety Co.* (1978) 83 Cal.App.3d 641 [148 Cal.Rptr. 80] and cases cited therein.)

[6]A heading in Kaiser's brief reads as follows: "North Star Has No Right to Contest Dates of Loss Agreed to by Respondents and Lloyds with Respect to Claims for Which It Paid No Money; the Trial Court's Order Excluding Evidence on this Point was Correct."

DISCUSSION

Pertinent provisions of the North Star policy read as follows:[7]

■ "NOW THEREFORE this Certificate is to further indemnify the Reinsured[8] against ultimate net loss arising out of the hazards covered and as defined in the underlying insurance . . . .

■ "THE REINSURED shall immediately advise the Reinsurer of any accident or occurrence which appears likely to result in liability under this Certificate and of subsequent developments likely to affect the Reinsurer's liability hereunder. The Reinsurer shall not, however, be called upon to assume charge of the settlement or defense of any claims made, or suits brought or proceedings instituted against the Reinsured, but shall have the right and opportunity to be associated with the Reinsured in the defense and trial of any such claims, suits or proceedings relative to any accident or occurrence which, in the opinion of the Reinsurer may create liability on the part of the Reinsurer under the terms of the Certificate. If the Reinsurer avails itself of such right and opportunity, the Reinsured and the Reinsurer shall cooperate in all respects so as to effect a final determination of the claim or claims. . . .

■ "UPON FINAL DETERMINATION by settlement, award or verdict of the liability of the Reinsured, the Reinsurer shall promptly pay the Reinsured as the Reinsured shall pay and shall have actually paid, the amount of any ultimate net loss coming within the terms and limits of this excess reinsurance. . . .

■ "EXCEPT AS MAY BE inconsistent with the above, the coverage provided by this Certificate shall follow the reinsuring agreements, conditions, and exclusions of the underlying insurance, . . .

■ "THE LIMITS OF THE UNDERLYING INSURANCE shall be maintained in full effect during the currency of this Certificate, except for reduction of the primary limits by exhausting of aggregate limits (if any) contained

---

[7]The bracketed paragraph numbers are not in the policy and are inserted and used only for our convenience.

[8]Although the policy refers to North Star as "the Reinsurer" and Kaiser as "the Reinsured" it is, of course, not a contract of reinsurance at all but one of excess insurance. It also describes itself as a "CERTIFICATE OF EXCESS REINSURANCE"—whatever that may be. In spite of this possible source of confusion, luckily the parties agree that the policy is one of excess insurance.

therein solely by payment of claims *in respect of accidents or occurrences happening during the period hereof. . . ."* (Italics added.)

It is obvious that under paragraph [5], just quoted, North Star's exposure expressly does not come into play unless the aggregate limits of the underlying Lloyd's policy have become exhausted with respect to accidents or occurrences during the policy period. If Kaiser is correct in its theory that North Star must accept accident or occurrence dates unilaterally determined by Kaiser and Lloyd's, it is clear that North Star would be at the mercy of the insured and the primary carrier.[9] Kaiser disingenuously argues that "[s]ince it was not controverted that Lloyds had paid $1,000,000 with respect to claims assigned to the period April 9, 1965 to April 9, 1966, it is clear that the risk of the exhausting of the underlying insurance, in fact, occurred and North Star had no right to challenge the dates of loss assigned to those claims already settled and paid by Lloyds and with respect to which it was not called upon to pay any sums." That, of course, is a classical bootstrap argument: North Star's failure to controvert that Lloyd's properly paid $1 million on 1965-1966 claims, was the result of Kaiser's successful motion to prevent it from attempting to do so.

■ Kaiser's contention that it and Lloyd's have the exclusive power to determine dates of loss, however detrimental such determinations may be to the excess insurer, simply does not square with the covenant of good faith and fair dealing which forms part of every insurance contract. (E.g., *Silberg* v. *California Life Ins. Co.,* (1974) 11 Cal.3d 452, 460 [113 Cal.Rptr. 711, 521 P.2d 1103].) That covenant is not a one-way street but requires that "neither party"—not the insured, nor the insurer—"will do anything to injure the right of the other to receive the benefits of the agreement, . . ." (*Id.,* p. 460.)

■ There can be no question that in this case the duty of good faith and fair dealing was owed to the excess insurer both by Kaiser, the excess-insured, as well as by Lloyd's the primary insurer. That precise question was decided in *Northwestern Mutual Ins. Co.* v. *Farmers' Ins. Group* (1978) 76 Cal.App.3d 1031 [143 Cal.Rptr. 415], where the primary carrier's bad faith refusal to accept settlement offers within its policy limits necessitated payment by the excess carrier, which payment it was

---

[9]We need not write a "how to" manual to describe the ways in which Kaiser and Lloyd's—who had an ongoing relationship stretching over several policy years—could, were they so minded. minimize Lloyd's total losses by bunching them in selected policy years in order to bring the excess carrier's coverage into play.

then permitted to recover from the primary carrier on the theory that the covenant of good faith and fair dealing had been breached.

This is not to say, of course, that North Star could not have bound itself contractually to accept loss allocations to particular policy periods agreed on between Kaiser and Lloyd's. In fact Kaiser suggests that this is precisely what North Star did.

Kaiser particularly relies on paragraphs [1], [3] and [4] of the North Star policy. Try as we might, we cannot read that policy to express or imply an intention on the part of North Star to accept any and all dates of loss which Kaiser and Lloyd's might agree to. It is perhaps not without significance that Kaiser ignores paragraph [2], which obligates it to notify North Star of any occurrence likely to affect its exposure and entitles North Star to participate in the defense of claims arising from such occurrences. While paragraph [2] itself is far from clear,[10] it does indicate that North Star was to have a voice in proceedings which were likely to lead to losses under its policy. The spirit of cooperation "in all respects" that is reflected in paragraph [2] is quite inconsistent with the unilateral right of allocation which Kaiser claims.

Contract language apart, Kaiser presents several arguments to the effect that it would be inexpedient to permit North Star to question a decision by Kaiser and Lloyd's to allocate a loss to the 1965-1966 policy year. Thus Kaiser argues that if the excess insurer is permitted to question such allocation, it will be more difficult to settle cases. Even if this were true, it would be a relatively small price to pay for not permitting an insured and a primary insurer to ride roughshod over the rights of the excess carrier. As a practical matter we doubt the correctness of Kaiser's conclusion: our experience has been that bona fide disputes as to the correct policy period to which a loss should be allocated are rare.[11] Inviting the advance agreement of the excess carrier or carriers as part of an overall settlement should decrease, rather than increase, the occasions for litigation.

[10] Was North Star only entitled to notice of claims it was likely to end up paying in whole or in part, or was it entitled to notice of any claim, however small, simply because it might hasten the day when the Lloyd's aggregate would become exhausted and North Star would, in effect, become the primary insurer?

[11] Witness the relative dearth of cases on the issue. Even in a superlitigious society such as ours, relevant California authorities are considerably fewer than a dozen. See the cases referred to in footnote 5, *ante*, and the authorities cited therein.

Finally Kaiser seriously claims that the trial court's ruling was sustainable under section 352 of the Evidence Code. If we discussed this contention at length, we would only give aid and comfort to the notion that a party's entire defense can be thrown out of court because it will necessitate an undue consumption of time.

Kaiser's second principal contention is that even if its *in limine* motion had been denied, the judgment would still have been the same. Under this rubric Kaiser successfully destroys some irrelevant contentions or arguments by North Star, but fails to come to grips with the basic problem: that we simply do not know what facts bearing on the correct allocation of the Barrett claim North Star was prevented from proving. There is a suggestion—no more than that—that North Star may have acquiesced in the Barrett claim being allocated to the 1965-1966 policy year because it had actual or constructive notice of what Kaiser and Lloyd's were doing. It is not, however, argued that such a finding is compelled by the evidence; thus there is no reason for examining the particulars relied on.

We conclude, therefore, that the trial court prejudicially erred in its *in limine* ruling fixing the date of loss of the Barrett claim, after refusing to receive evidence with respect to its proper allocation. We feel compelled, however to point out that we do not decide that the Barrett claim was erroneously allocated even if North Star's offer of proof had been accepted. Given only the bare facts that the patient was treated over several policy years, apparently suffered some ill effects during some or all of those years and eventually lost a limb because of alleged malpractice, we would neither care nor dare to fix the proper allocation. Before venturing to suggest the correct result—assuming there is only one—a court would have to know the details of the claimed malpractice, its sequelae in the various policy periods, as well as any applicable customs in the insurance industry in general and among the parties in particular.

Finally, while we have held that the parties' relationships are governed by the implied covenant of good faith and fair dealing rather than by unilateral fiats of Kaiser and Lloyd's, we make no attempt to define precisely what rights and duties that entails in a case such as this. Such questions are best decided in the light of concrete facts—the very facts which North Star was prevented from producing. (See generally *Neal* v.

*Farmers Insurance Exchange* (1978) 21 Cal.3d 910, 921-922, fn. 5 [148 Cal.Rptr. 389, 582 P.2d 980].)

North Star raises another issue concerning certain items of costs. Since its resolution depends on the ultimate outcome of the litigation, we shall not discuss it.

Reversed.

Stephens, J., and Hastings, J., concurred.

A petition for a rehearing was denied April 10, 1979, and respondents' petition for a hearing by the Supreme Court was denied May 17, 1979.