[Nos. D017339, D017510. Fourth Dist., Div. One. Jan. 21, 1994.]

FIREMAN'S FUND INSURANCE COMPANY, Plaintiff and Appellant,
v.
MARYLAND CASUALTY COMPANY, Defendant and Respondent.

**COUNSEL**

Bacalski & Byrne, A. Daniel Bacalski, Jr., Christopher J. Workman and Thomas A. Leary for Plaintiff and Appellant.

Bronson, Bronson & McKinnon and Ralph S. LaMontagne, Jr., for Defendant and Respondent.

## OPINION

**FROEHLICH, J.**—Fireman's Fund Insurance Company (Fireman's) appeals from an order dismissing its complaint after summary judgment was entered in favor of respondent Maryland Casualty Company (Maryland).[1] Fireman's suit against Maryland sought reimbursement for some or all of the funds Fireman's had advanced to settle a lawsuit by a third party. Fireman's contended Maryland improperly settled a construction defect case by misallocating its "primary" policy proceeds, and as a result Fireman's was required to pay, under its "excess" policy, $2,453,000 to a third party.

The trial court granted summary judgment in Maryland's favor on numerous grounds. We must synopsize this sprawling litigation before examining Fireman's contentions.

## I

## BACKGROUND

### A. *The Parties*

Fireman's and Maryland were the liability insurers for certain parties (collectively referred to as Kelly) who developed a condominium complex. Maryland issued the "primary" policies to Kelly for six successive years, from 1979-1980 to 1984-1985. During this period various insurers provided "excess" coverage to Kelly. One of these "excess insurers" was Fireman's, whose policy was in effect for one year: 1984-1985.

### B. *The Original Lawsuits*

#### 1. *The Litigation*

The original litigation began as a homeowners association lawsuit against Kelly and numerous subcontractors for defective construction. Kelly later cross-complained against Maryland, as primary insurer for the relevant years

---

[1] Fireman's also purported to appeal from the orders granting summary adjudication of the individual causes of action and summary judgment. Although such orders are nonappealable (*Avila* v. *Standard Oil Co.* (1985) 167 Cal.App.3d 441, 445 [213 Cal.Rptr. 314]), we may reach the merits because the appeal from the order dismissing the complaint was timely.

(1979 to 1985), claiming Maryland wrongfully failed to defend and indemnify for the liabilities. Maryland later filed a separate declaratory relief action against Kelly and other insurers for Kelly, including Fireman's, seeking a declaration of its obligations regarding Kelly's liabilities and seeking reimbursement from the other potentially liable insurers. The homeowners association cross-complained in Maryland's action, alleging nonpayment of insurance proceeds, and named Fireman's among its cross-defendants. All of these actions, along with others, were consolidated into a single action.

### 2. The Settlement

After years of litigation, which included entry of a judgment in favor of the homeowners association and against Kelly, most of the parties reached a settlement agreement (hereafter called the Maryland settlement). However, Fireman's was not among the settling parties. The settling parties moved to confirm the good faith nature of the Maryland settlement under Code of Civil Procedure[2] section 877.6. Fireman's opposed the motion. The court granted the motion and entered its order confirming the settlement to be a "good faith" settlement within the meaning of section 877.6.[3]

Certain terms of the Maryland settlement are significant. First, the settling parties purported to "allocate" Maryland's contribution (amounting to $3,550,000) to the four policies in effect from March 1981 through March 1985. No contributions were made from Maryland's earlier policies—those in effect in 1979-1980 and 1980-1981.

Second, under the Maryland settlement the homeowners association released Maryland, and further covenanted it would not seek any additional recovery on its judgment from Kelly, but would seek any additional recovery on its judgment only from Fireman's. Kelly in turn released all claims it had against Maryland, including those for bad faith.

### C. The Current Lawsuit

### 1. Fireman's Claims

Shortly after the Maryland settlement was confirmed, Fireman's also settled with and paid the homeowners association. Thereafter, Fireman's sued Maryland in this action, seeking reimbursement for Fireman's payments. Fireman's alleged that the damages suffered by the homeowners

---

[2]All statutory references are to the Code of Civil Procedure unless otherwise specified.

[3]In a related appeal, which we hear and decide concurrently with this appeal, Fireman's challenges the propriety of the trial court's order confirming the good faith settlement.

association were manifest during all six years that Maryland's primary policies were in effect; that Maryland was therefore obliged to pay its policy limits for all six years; that Maryland wrongfully failed to exhaust all of the primary policies in settling the claim, Maryland having paid no moneys attributable to the 1979-80 or 1980-81 policies; and that as a result of Maryland's wrongful refusal to pay, Fireman's was obligated to pay the homeowners association. Fireman's sought to recover its payments under theories of equitable subrogation and breach of the implied covenant of good faith and fair dealing, and asserted a claim for declaratory relief.

## 2. The Summary Judgment

Maryland's first summary adjudication motion was directed solely at Fireman's equitable subrogation claim. Maryland argued Fireman's could not recover because it could not demonstrate two essential elements of an equitable subrogation action by an excess insurer. First, Maryland argued an excess insurer's payment to the third party must be to discharge a liability of the insured, pointing out that the insured here had already been released by the third party. Second, Maryland argued the claim asserted by the excess insurer must be one which the insured could have asserted, noting that the insured here had already released Maryland from any claims. The trial court agreed and granted summary adjudication based on both arguments.[4]

Maryland subsequently moved for summary judgment, seeking to extinguish the remaining claims for declaratory relief and "breach of the implied covenant of good faith." It argued the declaratory relief action should be dismissed because Fireman's had already paid the money, and hence its claim (if any) had "crystallized" into a cause of action for money damages.[5] Maryland argued the "breach of the implied covenant" claim should be dismissed because there was no triable issue of fact that the insured had released Maryland from such claim, extinguishing any right by Fireman's to pursue such claim. Maryland also argued the order on the good faith settlement motion collaterally estopped Fireman's from relitigating the issue

---

[4]The court also granted summary adjudication, under section 437c, subdivision (b), because Fireman's failed to identify which material facts were disputed or undisputed.

[5]On appeal, Fireman's failure to argue or cite authority in support of revival of its declaratory relief cause of action suffices to dismiss further consideration of this issue. (*Tan v. California Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 800, 811 [189 Cal.Rptr. 775] [points not argued on appeal deemed waived or abandoned].) Moreover, any effort to resurrect that claim would fail, because declaratory relief operates prospectively, rather than to redress past wrongs (*Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 848 [92 Cal.Rptr. 179, 479 P.2d 379]); hence Fireman's remedy lies in pursuit of ". . . a fully matured cause of action for money, if any exists at all" (*Jackson* v. *Teachers Ins. Co.* (1973) 30 Cal.App.3d 341, 344 [106 Cal.Rptr. 208]), not in a declaratory relief claim.

of whether the settlement agreement was in bad faith.[6] The trial court agreed with all three contentions and granted summary judgment in Maryland's favor.

## D. *The Current Appeal*

Fireman's first argues on appeal that the Maryland settlement was collusive and unfair to Fireman's because (1) it improperly allocated damages to policy periods during which Fireman's provided coverage, when in fact damages had manifested in earlier policy periods; and (2) it improperly obtained Kelly's release of its claims against Maryland for bad faith, thereby cutting off Fireman's equitable subrogation rights. Second, it argues this collusive settlement violated an independent duty owed by Maryland to Fireman's, the breach of which is actionable.

We conclude summary judgment on Fireman's claim for equitable subrogation was properly granted because several elements of such a claim are absent here. We also conclude a primary insurer's obligation of good faith is ordinarily owed to its insured, not to an excess insurer, and that Kelly's release of Maryland is therefore fatal to Fireman's claim.[7]

---

[6]We caution that the issue litigated on summary judgment was *not* whether the *statutory* bar of section 877 applied to Fireman's "breach of the implied covenant" claim; that is, the court did not decide that the "good faith order" statutorily barred Fireman's action as one for indemnity among "joint tortfeasors or co-obligors on a contract." Instead, the issue litigated and decided below was whether Fireman's was collaterally estopped from claiming the settlement was in *"bad"* faith when it had previously been found to be in *"good"* faith. In that we conclude Fireman's bad faith claim was properly dismissed for other reasons, we need not decide whether the trial court was correct in using collateral estoppel as an additional basis for summary judgment.

[7]This court had also requested supplemental briefing from the parties to evaluate whether Maryland and Fireman's were "joint tortfeasors or co-obligors on a contract" to whom the prior "good faith determination" might apply as a bar to future claims, and whether the bar would apply to the type of claims asserted here. We are cited no authority holding a primary insurer and an excess insurer are "joint tortfeasors," and at least one court has concluded an excess insurer is *not* a joint tortfeasor within the ambit of section 877. (See *Pacific Estates, Inc.* v. *Superior Court* (1993) 13 Cal.App.4th 1561 [17 Cal.Rptr.2d 434].) The question of whether a primary and an excess insurer might fall under the remaining category of "co-obligors on a contract debt" has produced a split of authority: the *Pacific Estates* case decided they did not, whereas in *Diamond Heights Homeowners Assn.* v. *National American Ins. Co.* (1991) 227 Cal.App.3d 563 [277 Cal.Rptr. 906] the court held they did fall under the category of "co-obligors on a contract debt." Were it necessary to decide the issue, we would be inclined toward the *Pacific Estates* view, because by definition a primary and an excess insurer are *serial* obligors on separate contracts, not *co*-obligors on *a* contract debt. However, even if we adopted the *Diamond Heights* view, the statutory bar would *still* not apply here because these insurance policies were issued before 1988. Contracts entered before 1988 are exempt from the statutory bar against contribution among co-obligors. (See § 877, subd. (d).) In any event, all these issues become academic in light of our twin determinations that (1)

## II

## ANALYSIS

### A. *Standard of Review*

■ The purpose of summary judgment is to resolve litigation when there are no triable issues of material fact. (*Tollefson* v. *Roman Catholic Bishop* (1990) 219 Cal.App.3d 843, 852 [268 Cal.Rptr. 550].) Where there are no triable issues of fact, and only issues of law are disputed, summary judgment is proper. (*Seaber* v. *Hotel Del Coronado* (1991) 1 Cal.App.4th 481, 487 [2 Cal.Rptr.2d 405].)

■ On appeal, this court must conduct de novo review to determine whether there are any triable factual issues. (*Pearl* v. *General Motors Acceptance Corp.* (1993) 13 Cal.App.4th 1023, 1027 [16 Cal.Rptr.2d 805].) The appellate court should affirm the judgment of the trial court if it is correct on any theory of law applicable to the case, including but not limited to the theory adopted by the trial court, providing the facts are undisputed. (*Lucas* v. *Pollock* (1992) 7 Cal.App.4th 668, 673 [8 Cal.Rptr.2d 918]; *Koch* v. *Rodlin Enterprises, Inc.* (1990) 223 Cal.App.3d 1591, 1593 [273 Cal.Rptr. 438].) Thus we must affirm so long as any of the grounds urged by Maryland, either here or in the trial court, entitle it to summary judgment. (*Maryland Casualty Co.* v. *Reeder* (1990) 221 Cal.App.3d 961, 966-967 [270 Cal.Rptr. 719].)

### B. *Summary Judgment Was Proper on Fireman's Equitable Subrogation Claim*

■ We first examine whether Fireman's equitable subrogation claim was viable.[8] The specific question is: Was Fireman's entitled to pursue Maryland, to obtain repayment of the amounts Fireman's paid the homeowners association, under a claim for equitable subrogation?

■ Equitable subrogation permits a party who has been required to satisfy a loss created by a third party's wrongful act to "step into the shoes"

---

equitable subrogation is unavailable for other reasons, and (2) Fireman's has shown no contractual relationship with Maryland upon which to premise a claim for breach of the implied covenant.

[8]Maryland correctly notes that Fireman's opening brief on appeal contains no argument expressly directed toward demonstrating how the equitable subrogation claim is viable. Failure to argue a point in a brief permits us to deem such point abandoned. (*Elster* v. *Friedman* (1989) 211 Cal.App.3d 1439, 1440-1441, fn. 1 [260 Cal.Rptr. 148].) However, we reach the merits of the claim because the issue of equitable subrogation is integrally related to the resolution of other arguments raised on appeal.

of the loser and pursue recovery from the responsible wrongdoer. (*Self-Insurers' Security Fund* v. *ESIS, Inc.* (1988) 204 Cal.App.3d 1148, 1155 [251 Cal.Rptr. 693].) In the insurance context, the doctrine permits the paying insurer to be placed in the shoes of the insured and to pursue recovery from third parties responsible to the insured for the loss for which the insurer was liable and paid. (*Liberty Mut. Fire Ins. Co.* v. *Auto Spring Supply Co.* (1976) 59 Cal.App.3d 860, 864 [131 Cal.Rptr. 211].)

■ In *Troost* v. *Estate of DeBoer* (1984) 155 Cal.App.3d 289 [202 Cal.Rptr. 47] the court identified six elements essential to an insurer's cause of action based on equitable subrogation: "The elements . . . [are] (1) [t]he insured has suffered a loss for which the party to be charged is liable, either because the latter is a wrongdoer whose act or omission caused the loss or because he is legally responsible to the insured for the loss caused by the wrongdoer; (2) the insurer, in whole or in part, has compensated the insured for the same loss for which the party to be charged is liable; (3) the insured has an existing, assignable cause of action against the party to be charged, which action the insured could have asserted for his own benefit had he not been compensated for his loss by the insurer; (4) the insurer has suffered damages caused by the act or omission upon which the liability of the party to be charged depends; (5) justice requires that the loss should be entirely shifted from the insurer to the party to be charged . . . ; and (6) the insurer's damages are in a stated sum, usually the amount it has paid to its insured, assuming the payment was not voluntary and was reasonable." (*Id.* at p. 294.)

■ The undisputed facts show that neither the third nor fourth element is present.[9] First, Kelly expressly released Maryland from all claims, including bad faith. Accordingly, there was no existing cause of action which Kelly could have assigned or asserted on its own behalf against Maryland. ■ Since the subrogated insurer stands in the shoes of its insured, the insurer has no greater rights against the third party than did the insured (*Continental Mfg. Corp.* v. *Underwriters at Lloyds London* (1960) 185 Cal.App.2d 545, 556 [8 Cal.Rptr. 276]) and is subject to all defenses the third party could have asserted against the insured. (*Hubbard* v. *Boelt* (1983)

---

[9]Maryland also argues the first element (i.e., the insured suffered a loss for which the party to be charged is liable) is absent, because the subrogor (Kelly) was released by the homeowners association as part of the Maryland settlement and suffered no actual or potential loss. However, Kelly was not *released* by the homeowners association. Instead, Kelly received a "covenant not to execute" which protects the insured but does not discharge the insurer from liability. (See, e.g., *Samson* v. *Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 240-241 [178 Cal.Rptr. 343, 636 P.2d 32].) In light of our conclusions, we need not decide whether an insurer's payment to a third party, made despite a covenant not to execute having been given to an insured, satisfies the first element of an equitable subrogation claim.

140 Cal.App.3d 882, 884 [190 Cal.Rptr. 15].) Thus, when an insured has released a third party, neither the insured nor the subrogated insurer has any rights to recover from the third party. (See generally, *Liberty Mut. Ins. Co.* v. *Altfillisch Constr. Co.* (1977) 70 Cal.App.3d 789 [139 Cal.Rptr. 91].)

The effect of a release was examined in *Continental Mfg. Corp.* v. *Underwriters at Lloyd's of London, supra*, 185 Cal.App.2d 545. There, the insured (Continental) leased an aircraft to Bell, and the lease specified Bell would not be responsible for damage to the aircraft and would be held harmless from any occurrence involving the aircraft. (*Id.* at p. 547.) When the plane was involved in an accident while being operated by a Bell employee, the insurer refused to pay the claim of Continental on the ground that Continental's release of Bell had foreclosed insurer's rights of subrogation against Bell. The court agreed, concluding: "[Insured], having by contract released Bell . . . could not place any claim against Bell. Unquestionably, [insurer], as the subrogee of [insured], could have no rights that [insured] did not have and, therefore, could not maintain an action against Bell . . . . In other words, the defendant-insurer merely stands in the shoes of [insured] and has no greater rights against a third person than it has." (*Id.* at pp. 555-556.)

The third essential element of a claim under equitable subrogation (i.e., that the insured have an existing assignable cause of action against the third party) is unquestionably absent here, because the insured clearly released Maryland, the party against whom Fireman's equitable subrogation action is targeted.[10]

The fourth element (i.e., the insurer suffered damages *caused* by the act or omission upon which the liability of the party to be charged depends) is also absent, because Maryland did nothing to cause Fireman's to make any payment. The effect of the Maryland settlement agreement, at least insofar as Fireman's was concerned (since both Maryland and Kelly were free of all further claims), was to narrow the remaining issues to one: Did Fireman's have any liability to the homeowners? Fireman's disclaimed responsibility by asserting the damages had manifested before Fireman's policy became effective, a contention which, if factually correct, rendered Fireman's nonliable. (See *Fireman's Fund Ins. Co.* v. *Aetna Casualty & Surety Co.* (1990)

---

[10]At trial, Fireman's argued the release was "void" because it violated the Fireman's policy clause prohibiting the insured from doing anything to prejudice Fireman's subrogation rights. While breach of a policy provision might provide an insurer grounds to deny payment of a claim (see *Liberty Mut. Ins. Co.* v. *Altfillisch Constr. Co., supra*, 70 Cal.App.3d at pp. 796-798 [insured's release harmed insurer's subrogation rights and excused insurer from payment of policy benefits]), we are unaware of any authority suggesting the release is void *ab initio*, an argument Fireman's does not resurrect on appeal.

223 Cal.App.3d 1621, 1627-1629 [273 Cal.Rptr. 431].) Assuming Fireman's was factually correct,[11] its payment represented amounts for which neither it nor any other party was liable because it paid an "obligation" which had already been discharged by the Maryland settlement. Thus if the damages occurred in Maryland's tenure, Fireman's acted as a mere volunteer in making the payment, having had no legal or moral obligation to pay a previously discharged debt. (See generally, *Smith* v. *Travelers Indemnity* Co. (1973) 32 Cal.App.3d 1010, 1018-1019 [275 Cal.Rptr. 17].) Indeed, in *Great American West, Inc.* v. *Safeco Ins.* (1991) 226 Cal.App.3d 1145 [277 Cal.Rptr. 349], this court noted that an insurer which paid for damages already manifested in prior policy periods and hence already covered by other insurers ". . . of course . . . did so as a volunteer because postmanifestation carriers have no liability for continuing property damage." (*Id.* at p. 1150, fn. 4.)

■■ ■ (3d) Since Fireman's payment was as a volunteer,[12] equitable subrogation is unavailable. (See generally, 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 171, pp. 851-853.) We perceive this also to be the equitable result, because permitting recovery would be unfair to Maryland. Maryland paid, and the homeowners accepted, $3,550,000 to extinguish Maryland's liability for damages manifested during Maryland's tenure. If Fireman's were permitted to recover from Maryland, Fireman's would effectively be permitted to obviate the release, to which Fireman's was not a party, and deprive Maryland of the benefit of the bargain it struck with the homeowners. Accordingly, since Fireman's had no obligation, actual or potential, to pay a discharged debt, Fireman's is a volunteer that cannot seek equitable subrogation.

---

[11]The entire thrust of Fireman's contention of nonliability was that the damages to the condominium project were "manifested" in earlier policy years, and hence the insurers in those earlier years (not Fireman's) were liable. To the extent the damages were in fact covered by Fireman's policy, Fireman's payment would of course not be "voluntary" but it also would not be recoverable from Maryland. We therefore examine whether Fireman's was a "volunteer" on the assumption that Fireman's correctly contended the damages had manifested during earlier policy years.

[12]We recognize that an insurer will not be deemed a volunteer if it denies coverage but still pays on the good faith, reasonable belief it *might* be liable to the subrogor. (See, e.g., *Pines of La Jolla Homeowners Assn.* v. *Industrial Indemnity* (1992) 5 Cal.App.4th 714, 725-726 [7 Cal.Rptr.2d 53].) However, Fireman's could not have reasonably believed it might have had liability for damages which accrued during Maryland's tenure, because the courts had by then definitively declared a later insurer was not liable for damages manifested in an earlier policy period. (See *Prudential-LMI Com. Insurance* v. *Superior Court* (1990) 51 Cal.3d 674, 693-699 [274 Cal.Rptr. 387, 798 P.2d 1230] ["first party" policy]; *Fireman's Fund Ins. Co.* v. *Aetna Casualty & Surety Co.*, *supra*, 223 Cal.App.3d 1621, 1627-1629 ["third party" policy].)

C. *Summary Judgment Was Proper on Fireman's Purported Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing*

 Fireman's attempted to pursue recovery on an entirely separate basis: for breach of the implied covenant of good faith and fair dealing. Fireman's argues that Maryland, as primary insurer, owed a duty of good faith and fair dealing to Fireman's, as excess insurer, which duty Maryland breached by misallocating policy benefits to maximize the liability of Fireman's. We reject Fireman's argument, because there is no evidence of any contractual relationship between Fireman's and Maryland, and hence Maryland owes no independent duty of good faith directly to Fireman's. Instead, an excess insurer may sue a primary insurer for breach of the implied covenant only by way of subrogation to the insured's rights. Such rights were released here, and therefore Fireman's purported claim for breach of the implied covenant fails.

 "The prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract." (*Smith* v. *City and County of San Francisco* (1990) 225 Cal.App.3d 38, 49 [275 Cal.Rptr. 17].) Without a contractual underpinning, there is no independent claim for breach of the implied covenant. (*Love* v. *Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1153 [271 Cal.Rptr. 246] [implied covenant is auxiliary and supplementary to express contractual obligations; it has no existence separate from the contractual obligations].) In the insurance context, our Supreme Court has concluded that nonparties to the insurance contract are not subject to a suit for breach of the implied covenant. (See *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 576 [108 Cal.Rptr. 480, 510 P.2d 1032].)

 The evidence here disclosed only two contracts: one between the insured and Maryland for primary coverage; and the other between the insured and Fireman's for excess coverage. There was no evidence that Fireman's and Maryland had any direct contractual relationship, and so we must evaluate whether any alternative basis exists for Fireman's claim against Maryland.

One basis urged by Fireman's is that an excess insurer is a third party beneficiary of the primary policy who can sue the primary insurer for breach of the implied covenant. Certainly a noncontracting party is entitled to sue an insurer for breach of the implied covenant *if* that noncontracting party is a third party beneficiary of the insurance contract. (See *Cancino* v. *Farmers Ins. Group* (1978) 80 Cal.App.3d 335, 344-345 [145 Cal.Rptr. 503]

[noncontracting party entitled to sue as express third party beneficiary of policy because he was an additional insured under the policy].) We acknowledge that some authorities have suggested an excess insurer is the "third party beneficiary" of the contract between the insured and the primary insurer. (See 7C Appleman, Insurance Law & Practice (Berdal ed. 1979) § 4682, pp. 28-33.) Under California law, however, a person who is incidentally benefited by the payment of policy proceeds is not a third party beneficiary entitled to sue for breach of the implied covenant. ( *Hatchwell* v. *Blue Shield of California* (1988) 198 Cal.App.3d 1027, 1034-1035 [244 Cal.Rptr. 249].)

 There is no evidence here that Fireman's qualifies as a third party beneficiary of Maryland's policy. To qualify as a third party beneficiary, the contract must be made *expressly* for the benefit of the third person. (*Thompson* v. *Cannon* (1990) 224 Cal.App.3d 1413, 1416 [274 Cal.Rptr. 608].) It is not enough that Fireman's, as an excess insurer, incidentally benefited from Maryland's contract with the insured. " 'The fact that [the excess insurer] is incidentally named in the contract, or that the contract, if carried out according to its terms, would inure to [the excess insurer's] benefit, is not sufficient to entitle [the excess insurer] to demand its fulfillment. It must appear to have been the intention of *the parties* to secure to [the excess insurer] personally the benefit of its provisions.' " (*Walters* v. *Marler* (1978) 83 Cal.App.3d 1, 33 [147 Cal.Rptr. 655], quoting *Walters* v. *Calderon* (1972) 25 Cal.App.3d 863, 871 [147 Cal.Rptr. 655].) Thus, even though a third party making a liability claim against an insured will benefit from the insurer's payment under the policy, the benefit is only incidental, and the claimant is not a third party beneficiary of the contract. (*Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 944 [132 Cal.Rptr. 424, 553 P.2d 584].)

Fireman's alternatively urges that a primary insurer owes a duty of good faith to the excess insurer independent of the contract. However, the California cases which have upheld an excess insurer's right to sue a primary insurer have concluded such right devolves by subrogation to the insured's rights against the primary carrier, rather than by reason of some independent duty. In *Commercial Union Assurance Companies* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912 [164 Cal.Rptr. 709, 610 P.2d 1038], the court stated that an excess carrier can sue a primary carrier for breach of the implied covenant, but cautioned: "This rule, however, is based on the theory of equitable subrogation: Since the insured would have been able to recover from the primary carrier . . . , the excess carrier, who discharged the insured's liability as a result of [the breach of the implied covenant], stands in the shoes of the insured and should be permitted to assert all claims

against the primary carrier which the insured himself could have asserted. [Citation.] Hence, *the rule does not rest upon the finding of any separate duty owed to an excess insurance carrier.*" (*Id.* at pp. 917-918, italics added.)

Subsequent California cases have reiterated that the excess insurer's ability to sue for breach of the implied covenant rests on equitable subrogation principles, not on any independent duty owed to the excess carrier.[13] (See *Continental Casualty Co.* v. *Royal Ins. Co., supra; Walbrook Ins. Co.* v. *Liberty Mutual Ins. Co.* (1992) 5 Cal.App.4th 1445, 1454 [7 Cal.Rptr.2d 513].) Although some jurisdictions may recognize an independent duty (see, e.g., *Ranger Ins. Co.* v. *Home Indem. Co.* (N.D.Ill. 1989) 714 F.Supp. 956, 960-962), the majority of jurisdictions apparently adhere to the view that an excess insurer has rights against the primary only by way of equitable subrogation. (*American Centennial Ins.* v. *Canal Ins.* (Tex. 1992) 843 S.W.2d 480, 482; *Continental Cas.* v. *Pullman, Comley, et al.* (7th Cir. 1991) 929 F.2d 103, 107 ["only a minority of states hold that primary insurer owes direct duty of good faith to excess insurer, rather than through equitable subrogation"].)

Fireman's relies principally on two cases for the proposition that an excess insurer can sue a primary insurer for breach of the implied covenant. One of those cases, however, is *Commercial Union Assurance Companies* v. *Safeway Stores, Inc., supra,* 26 Cal.3d 912, which (as previously discussed) specifically holds such a claim devolves by subrogation to the insured's rights. The other case, *Kaiser Foundation Hospitals* v. *North Star Reinsurance Corp.* (1979) 90 Cal.App.3d 786 [153 Cal.Rptr. 678], likewise fails to aid Fireman's. In *Kaiser* the insured assumed the first $25,000 of any claim, the primary insurer (Lloyd's) provided primary coverage above the $25,000 deductible up to an aggregate of $1 million per year, and the excess carrier

---

[13]We are aware of only one California case recognizing an independent duty flowing from the primary to the excess insurer: *Transit Casualty Co.* v. *Spink Corp.* (1979) 94 Cal.App.3d 124 [156 Cal.Rptr. 360]. The *Transit Casualty* court posited "triangular reciprocity" as the model for the imposition of obligations among the insured, primary insurer and secondary insurer. Triangular reciprocity would impose reciprocal obligations of good faith between the primary and excess insurer regardless of any contractual relationship. (*Id.* at pp. 132-135.) This view, however, has failed to gain any currency. Indeed, *Transit Casualty* was expressly disapproved (on other grounds) by the court in *Commercial Union Assurance Companies* v. *Safeway Stores, Inc., supra,* 26 Cal.3d 912. (See *Signal Companies, Inc.* v. *Harbor Ins. Co.* (1980) 27 Cal.3d 359, 365 [164 Cal.Rptr. 799, 612 P.2d 889, 19 A.L.R.4th 75].) In light of the *Commercial Union* statement that an excess insurer's right to sue a primary insurer rests in equitable subrogation and ". . . does not rest upon the finding of any separate duty owed to an excess insurance carrier" (26 Cal.3d at p. 918), it appears *Transit Casualty*'s "triangular reciprocity" approach has been at least impliedly overruled. (See *Continental Casualty Co.* v. *Royal Ins. Co.* (1990) 219 Cal.App.3d 111, 117-118, fn. 2 [268 Cal.Rptr. 193] [while *Commercial Union* did not expressly overrule *Transit Casualty*, it effectively did so in concluding equitable subrogation was the basis for suit].)

(North Star) provided excess coverage up to an aggregate of $2 million per year. When an asserted $350,000 claim invaded North Star's coverage, North Star claimed the insured and the primary insurer had, to North Star's detriment, improperly colluded by allocating an excessive number of claims to one policy year, causing the aggregate primary coverage to be exhausted and the $350,000 claim to "invade" the excess coverage. North Star believed a proper allocation would have rendered it liable for only $125,000, while Kaiser claimed the allocation was proper and North Star owed $184,168.25. Kaiser made up the difference. When Kaiser sued North Star for reimbursement, North Star raised the claim of improper collusion between Kaiser and Lloyd's. (*Id.* at pp. 788-790.)

Kaiser prevailed, and North Star appealed. Kaiser argued, in essence, that "it [was] none of North Star's business how Kaiser and Lloyd's allocate losses as far as policy periods are concerned." (*Kaiser Foundation Hospitals* v. *North Star Reinsurance Corp.*, *supra*, at p. 790.) Rejecting that contention, the *Kaiser* court stated: "Kaiser's contention that it and Lloyd's have the exclusive power to [allocate claims], however detrimental such determination may be to the excess insurer, simply does not square with the covenant of good faith and fair dealing . . . . [¶] There can be no question that in this case the duty of good faith and fair dealing was owed to the excess insurer both by Kaiser, the excess-insured, as well as by Lloyd's, the primary insurer. That precise question was decided in *Northwestern Mutual Ins. Co.* v. *Farmers' Ins. Group* (1978) 76 Cal.App.3d 1031 . . . ." (*Kaiser Foundation Hospitals*, *supra*, 90 Cal.App.3d at p. 792.)

Fireman's seizes upon the above passage to assert that an excess insurer does owe a duty of good faith independent of the insurance contract. However, we initially note the quoted passage—at least insofar as it deals with a primary insurer's duty—is dictum, because it purported to pronounce the obligations of Lloyd's, when in fact the only parties to the appeal were Kaiser and North Star, and the only issue was whether the insured owed a duty of good faith to the excess insurer. Thus statements of what duties were owed by the primary insurer were dicta.

Furthermore, the *Kaiser* court cited *Northwestern Mut. Ins. Co.* v. *Farmers' Ins. Group* (1978) 76 Cal.App.3d 1031 [143 Cal.Rptr. 415] as deciding "that precise question." The *Northwestern* decision, however, makes clear that the excess insurer's right to sue a primary insurer for bad faith arises from equitable subrogation, holding that the excess insurer ". . . upon payment of the insured's liability to the injured claimant . . . is equitably subrogated to the rights of the insured against the primary insurer, including his right of action for bad faith . . . ." (*Id.* at p. 1040.) Thus *Kaiser's*

statement as to the excess insurer's rights against the primary insurer is dictum, and relies on a case which only reconfirms that equitable subrogation is the basis for an excess insurer's rights.

Since the only basis for Fireman's to sue for breach of the implied covenant is by way of equitable subrogation to the insured's rights, and the insured released Maryland from all claims of bad faith, Fireman's claim for breach of the implied covenant is without vitality.

## DISPOSITION

The judgment is affirmed.

Todd, Acting P. J., and Huffman, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 25, 1994.