Filed 11/4/13  XL Specialty Ins. Co. v. St. Paul Mercury Ins. Co. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| XL SPECIALTY INSURANCE COMPANY, | |
| Plaintiff and Appellant, | G047371 |
| v. | (Super. Ct. No. 30-2011-00516588) |
| ST. PAUL MERCURY INSURANCE COMPANY, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Nancy Wieben Stock, Judge.  Affirmed.

Berger Kahn, David B. Ezra; Stinson Morrison Hecker, Scott C. Hecht, Russell J. Keller and Christina Arnone for Plaintiff and Appellant.

Comey & Rigby, Eugene J. Comey, Suzanne Rigby; Scheper Kim & Harris and Alexander H. Cote for Defendant and Respondent.

*          *          *

# I.  INTRODUCTION

Federal bank regulators took over Corona's Vineyard Bank in 2008.  Then the regulators and a group of the bank's unsecured creditors sued eight officers and directors of the bank for making the risky and improvident loans that got the bank into trouble in the first place.  Hoping to recoup their outlays, the regulators and the unsecured creditors looked to the "Director's and Officer's" (often called "D&O") insurance carried by Vineyard Bank's officers and directors.[1]

For each of the two years 2008 and 2009, the eight officers and directors had $25 million of D&O insurance.  But the composition of each year's insurance was different.  For 2008, the insureds had $15 million in primary coverage provided by defendant St. Paul Mercury Insurance Company, then another $5 million on top of St. Paul's $15 million provided by first level excess insurer National Union Fire Insurance Company of Pittsburg, then finally yet another $5 million provided by second level excess insurer Lexington Insurance Company.  But for 2009, the primary coverage provided by St. Paul was only $5 million.  On top of that $5 million was another $5 million provided by National Union as the first level excess insurer and, finally, the remaining $15 million was provided by plaintiff XL Specialty Insurance Company.

Here is a chart showing the respective composition of the two years' D&O coverage:

| Lexington $5 million second level excess | XL $15 million second level excess |
|---|---|
| National Union $5 million first level excess | National Union $5 million first level excess |
| St. Paul $15 million primary | St. Paul $5 million primary |
| 2008 | 2009 |

---

[1]      Seeking recovery from D&O insurance to offset at least some of the losses attendant on bank failures was a lesson learned from the savings and loan crisis of the late 1980's, carried forward to the recession that began in 2008.  (See Anbari, *Banking on a Bailout:  Directors' and Officers' Liability Insurance Policy Exclusions in the Context of the Saving and Loan Crisis* (1992) 141 U. Pa. L. Rev. 547, 547-548, fn. omitted ["Like the D&O's of other corporations, S&L managers frequently carry D&O liability insurance.  The federal government naturally attempts to recover on these policies when it sues insured S&L executives."]; Bishop, Law of Corporate Officers and Directors Indemnification Insurance (2012) § 8:2 ["D&O insurance industry analysts predicted $5.9 billion of losses to D&O insurers spread across 2007, 2008 and 2009 as a result of the meltdown of the subprime mortgage market and ensuing credit crisis  . . . ."].)

St. Paul and National Union agreed to pay $10.7 million to settle both the regulators' and unsecured creditors' suits. The $10.7 million was split two ways: $7.8 million to the regulators (more specifically, the FDIC in its capacity of receiver of the bank) and the remaining $2.9 million to the unsecured creditors.

But there was a difference in the way the two settlements were structured. The $7.8 million payment to the FDIC completely released the insureds from future liability. But the $2.9 million paid to the unsecured creditors did not result in a complete release. Rather, the insureds obtained a covenant not to execute on their personal assets; in return the insureds assigned any bad faith claims they had against excess insurer XL to the unsecured creditors.

Within two months of St. Paul and National Union's $10.7 million payment, XL paid the unsecured creditors $9.3 million and the litigation against the insureds (such as it was, that is, without any direct monetary exposure to them) – as well as any contract and bad faith claims against XL itself – went completely away.

XL then brought this suit against St. Paul to recover at least some of the $9.3 million it had paid to the unsecured creditors. Its basic theory is that the claims against the officers and directors were mostly, if not entirely, attributable to the 2008 policy year when XL was not "on the risk" at all, so the $9.3 million it paid really represents money which, in justice and fairness, should have been paid by St. Paul. It contends that money represents a claim that came in during 2008, when St. Paul's primary policy limits were $15 million. The trial court, however, sustained St. Paul's demurrer without leave to amend and a judgment of dismissal soon followed.

We affirm that judgment. At the most fundamental level, the $9.3 million paid by XL was paid *not* to protect the *insureds* from the claims of the unsecured creditors. It was paid by XL to extricate *itself* from the insureds' own bad faith claims against it; it makes no difference that those claims had been assigned to the unsecured

3

creditors.  As explained below, none of the theories advanced by XL as an excess insurer seeking some sort of recovery from St. Paul as primary insurer – equitable subrogation, equitable indemnity, equitable contribution, and, more exotically, unjust enrichment and tortious interference with contract – fit these facts.

## II.  FACTS

### A.  *Standard of Review on Demurrer*

Everybody knows that in reviewing a judgment after a demurrer has been sustained, the Court of Appeal must assume all facts set out in the complaint as true.  (If citation is needed, a recent one is *Henderson v. Newport-Mesa Unified School Dist.* (2013) 214 Cal.App.4th 478, 485.)  Everybody also knows, or should know, that in evaluating a complaint, we do not assume contentions, deductions or conclusions of law or fact to be true.  (E.g., *Federal Home Loan Bank of San Francisco v. Countrywide Financial Corporation* (2013) 214 Cal.App.4th 1520, 1526.)  This case, however, is one of those unusual ones in which separating out the facts from contentions, deductions and conclusions is seriously problematic.  XL's complaint and subsequent briefing feature more spin than a Koufax curveball.[2]  For example, the complaint states that St. Paul "improperly attributed" the vast majority of the $10.7 million payment to the federal regulators to its 2009 policy, as distinct from its 2008 policy.  It is indeed a "fact" for purposes of our analysis on demurrer that the majority of the $10.7 million was attributed to the 2009 policy in the settlement.  But whether that attribution was legally "improper" or not is another matter.  While we recognize XL *claims* the attribution was improper,

_____

[2]     The leitmotif of each parties' briefing on appeal is drawn from baseball:  Both St. Paul and XL present themselves as batters who stepped up to the plate on behalf of the insureds.  As XL in particular spins the yarn, the case was the equivalent of a baseball game with two outs in the bottom of the ninth, but St. Paul had just struck out by letting the insureds obtain only a covenant not to execute as distinct from a complete release, the equivalent of leaving the winning runs stranded on base.  At that point it was mighty XL who came to the plate on behalf of the Vineyard Nine (as it turns out, the number of insureds actually does add up to nine persons, if one counts two corporate Vineyard Bank entities as one) and homered, bringing in the winning runners in the form of a final release of the insureds from all liability.  As explained in part III. below, XL's version of events is more like a field of dreams than a Thayer poem.

4

that does not make it a fact, and we should note at this point that even the basic question of whether there is insurance "coverage" at all for a given claim is a conclusion of *law*, arrived at *after* ascertaining the facts, and is not itself a "fact" to be treated as a given. (See *Employers Casualty Co. v. Northwestern Nat. Ins. Group* (1980) 109 Cal.App.3d 462, 473.[3])

The case is further complicated by the matter of judicial notice. In support of its demurrer, St. Paul asked the trial court to take judicial notice of a number of documents from the FDIC's and unsecured creditors' litigation in federal bankruptcy court. The trial court granted the request. There is, of course, no question that judicial notice can be taken of the records of the courts of the United States (Evid. Code, § 452, subd. (d)), but here we must again be careful to separate facts from assertions. In taking judicial notice of court records, we are limited to matters which are indisputably true. (See Rylaarsdam, et al. Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2013) ¶ 7:15.1, p. 7(1)-9.) The import of the distinction becomes clear anon.

B. *The Claims and Litigation Involving the Insureds*

On December 30, 2008 – while the 2008 policies were still in effect – the president of Vineyard Bank sent a "Notice of Potential Claims" to the primary insurer, St. Paul, informing it of looming trouble. The bank had exceeded tolerance limits for construction and land loans, the Office of the Comptroller of the Currency had designated Vineyard Bank to be in "troubled condition," and potential shareholder suits or class actions might be filed for waste of corporate assets and other causes of action. St. Paul wrote back in late January 2009, asserting the notice "lacked certain information required" by its policy. That information was provided in June 2009. [4]

---

[3]     *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1137, disapproved *Employers Casualty* on the unrelated point in which it excused a litigant's failure to bring to a trial court's attention an omission or ambiguity in a statement of decision.

[4]     XL's complaint is not more specific.

5

The bank went into bankruptcy in July 2009.[5]  In the bankruptcy court a committee representing unsecured creditors filed an action against a group of former officers and directors of the bank in December 2009.  The pleadings filed on behalf of the unsecured creditors charged that from 2005 to 2007 the officers and directors exercised inadequate oversight in approving the bank president Norman Morales' strategy of concentrating on "'high risk lending in tract and luxury home construction, multi-unit housing, and commercial lending.'"  By the spring of 2008 this strategy had forced the bank to write off over $200 million in bad loans, forcing the July 2009 bankruptcy.  By 2010 a "liquidating trustee" had been appointed to prosecute the claims of the unsecured creditors.

Another claim, substantively the same but made by a different entity, also emerged in December 2009.  The FDIC had stepped in as receiver of the bank when it was formally closed in July 2009, and counsel for the FDIC now asserted the officers and directors had "permitted a culture of poor or lax underwriting" and demanded payment of $60 million.

Both the unsecured creditors' suit and the FDIC claims were the subject of a settlement reached in June 2011.  St. Paul paid $5.7 million[6] and National Union paid $5 million.  The FDIC completely released the officers and directors for its $7.8 million share.[7]  The officers and directors, for their parts, released all their claims against St. Paul.  The unsecured creditors received $2.9 million (the exact figure), but did not release the officers and directors.  Instead they gave the officers and directors a covenant not to

---

[5]  The FDIC's failed bank list gives July 17, 2009 as the official closing date.

[6]  $5,692,826.31 to be exact.

While not spelled out in the complaint, there seems to a reason St. Paul's payment had to be calculated down to the last 31 cents.  As the Rutter Group insurance treatise notes, D&O policies are "'self-consuming,'" meaning "defense costs reduce indemnity limits."  (See Croskey et al., Cal. Practice Guide:  Insurance Litigation (The Rutter Group 2013)  ¶ 7:1559.6, p. 7-F-3, hereafter, "Rutter Insurance Treatise.")  Presumably the 31 cents was part of a lawyers' bill for a precise sum.

[7]  $7,792,826.31 to be exact.

execute any judgment obtained against them, receiving from the insureds an assignment of their rights against XL.

XL was not part of the settlement reached in June 2011. The precise reason for its absence is glossed over in the complaint, but the reason seems obvious and is confirmed by an admission (at the bottom of page 9) in XL's opening brief on appeal: XL didn't think it owed anything to the officers and directors because both the unsecured creditors' claims and the FDIC claim should be properly attributed to 2008, when XL had no risk at all.[8]

In any event, the unsecured creditors-FDIC agreement with St. Paul and National Union was made June 28, 2011, and approved by the bankruptcy court on July 29, 2011. On August 15, 2011, less than three weeks after the approval of the first settlement by the bankruptcy court, XL entered into an agreement with the unsecured creditors to dismiss all claims against the insureds in return for XL's payment of $9.3 million (exact figure). XL also promised not to seek any reimbursement from the insureds, though it specifically reserved its right to pursue claims against St. Paul, National Union and Lexington (the second level excess insurer from 2008). This second settlement was approved by the bankruptcy court on September 23, 2011.

C. *Claims and Litigation Involving the Insurers*

On October 19, 2011, within a month of the bankruptcy court's approval of the second settlement, XL filed this action against St. Paul. Its complaint asserts theories against St. Paul of equitable subrogation, equitable indemnification, and unjust enrichment. In its briefing on appeal, XL also asserts it might be able to state claims

---

8     From the opening brief: "Because the *Holding Company Action* [the unsecured creditors' suit in bankruptcy court] and the FDIC Demand fell within the coverage provided by Tower 1 [2008], XL did not participate in the Initial Partial Settlement." We note that XL's brief never quite comes out and says that *all* of the $9.3 million it paid was really for claims exclusively attributable to the 2008 policy year. Instead, XL suggests only *most* of the money is attributable to 2008.

7

under the theories of equitable contribution and tortious interference with contract as well.

But the case never got out of the pleading stage. The trial court sustained St. Paul's demurrer without leave to amend, reasoning, among other things, that the release of St. Paul by the insureds meant St. Paul had no obligation to them which XL could assert by way of subrogation or indemnity. This appeal timely followed.

## III. DISCUSSION

### A. *The Three, Really Two, Main Theories*

We must confront at the outset a bit of taxonomical confusion inherent in the way XL has framed its case against St. Paul. XL's complaint alleges equitable subrogation and equitable indemnity. On appeal, it further asserts it could successfully amend its complaint to allege a third theory not yet in its complaint, equitable contribution. The problem with this way of structuring these claims is that, on examination, in the insurer-versus-insurer context there is no real difference between equitable indemnity and equitable contribution. The concept of *joint obligation*, which is the foundation of equitable *indemnity* (see *Prince v. Pacific Gas & Electric Co.* (2009) 45 Cal.4th 1151, 1158 ["traditional equitable indemnity . . . 'is premised on a joint legal obligation to another for damages'"]), translates, in the insurance context, into the concept of "*same risk*," which is the foundation of equitable *contribution*. (See *Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1295, italics added[9]; *Herrick Corp. v. Canadian Ins. Co.* (1994) 29 Cal.App.4th 753, 759-760 [noting first that "insurers of the 'same risk' may sue each other for contribution" and then later observing that insurers "in their role as insurers, do not commit the torts for which claimants seek to hold policyholders responsible"].) Trying to parse some

---

[9] As it turns out, two of the most important cases bearing on the issues before us both involved Fireman's Fund suing Maryland Casualty: the 1998 case we just referenced, and *Fireman's Fund Ins. Co. v. Mary Casualty Co.* (1994) 21 Cal.App.4th 1586. We'll call the former *Fireman's v. Maryland 1998*, and the second one *Fireman's v. Maryland 1994*.

8

theoretical difference, in the insurer-versus-insurer context, between equitable indemnity and equitable contribution is a snipe hunt we choose not to join. (Cf. *Fireman's v. Maryland 1998, supra*, at p. 1291 ["It is also difficult to think of two legal concepts that have caused more confusion and headache for both courts and litigants than have contribution and subrogation."].)[10]

B. *Equitable Subrogation:*

a. *two cases, both on point*

Since equitable subrogation is derivative of the rights of the insured, it follows that a viable equitable subrogation claim requires the *insured* to have some existing, assignable right which the paying insurer must have paid for before it can seek recoupment from another insurer. If there is no existing assignable right the insured could assign to the insurer who claims equitable subrogation, the insured owns no "shoes" for the insurer to wear. (See Rutter Insurance Treatise, *supra*, ¶ 8:65.1, p. 8-26 ["The right of subrogation is purely derivative; i.e., a subrogated insurer stands in the shoes of its insured. It has no greater rights than the insured and is subject to the same defenses against the insured."].)

The need for an existing, assignable right held by the insureds and for which the insurer paid, is an unavoidable stumbling block for XL here. The point is illustrated by the two appellate cases which the trial court found dispositive, *United Services Automobile Assn. v. Alaska Ins. Co.* (2001) 94 Cal.App.4th 638 and *Fireman's v. Maryland 1994*, *supra*, 21 Cal.App.4th 1586. We also find them dispositive and therefore explain them in some detail.

We begin with the earlier, *Fireman's v. Maryland 1994*. The case arose out of claims by a condominium homeowners' association against an insured property

---

10      *Lexington Ins. Co. v. Sentry Select Ins. Co.* (E.D. Cal. June 5, 2009, No. CVF 08-1539 LJO GSA) [2009 WL 1586938] explicitly notes the two concepts have been conflated. (See *id*. at p. 14 ["Sentry notes that courts have equated equitable contribution with indemnity to render applicable here the distinct principles of contribution and subrogation" and then treating equitable indemnity in terms of equitable contribution].)

developer. There was a settlement with the claimant association, in which one of the primary insurers (Maryland) paid some $3.55 million to the association, and obtained a release of any claims against it held by either the association or the property developer. (*Fireman's v. Maryland 1994, supra*, 21 Cal.App.4th at p. 1592.) But the excess insurer for the year 1984-1985 (Fireman's) was not among the settling parties. It thought it was off the hook because the damage had manifested itself prior to the inception of its policy. Even so, shortly after the settlement facilitated by the primary insurer, the excess insurer also paid – though the opinion is not clear exactly how much – the homeowner's association. (*Ibid.*) The excess insurer – Fireman's – then sued primary insurer Maryland, arguing Maryland should have exhausted its primary policies for earlier years, and its failure to do so created an obligation on Fireman's part to pay the homeowners' association. It sought to recover from Maryland on a theory of, among other things, equitable subrogation. (*Id*. at pp. 1592-1593.) The trial court rejected the equitable subrogation claim in a summary adjudication motion, a ruling later upheld by Division One of this court on review from a broader summary judgment motion.

Our colleagues in San Diego reasoned that the release given by the claimant homeowners' association to the primary insurer was "fatal" to the excess insurer's claim. (*Fireman's v. Maryland 1994, supra*, 21 Cal.App.4th at p. 1594.) Elaborating, the court identified two requirements for a successful equitable subrogation claim: (a) "an existing, assignable cause of action against the party to be charged" and (b) the paying *insurer* having "suffered damages caused by the act or omission upon which the liability of the party to be charged depends," i.e., causation. (*Id*. at p. 1596.) The release obtained by the primary insurer extinguished all claims against it. Moreover, there was no causation because – taking the excess insurer at its word that the damages had manifested themselves prior to its policy – it had paid on a claim it had no reason to pay on. (*Id*. at p. 1598.) As the court explained, the consequences of Fireman's position were unacceptable: It would mean depriving the primary insurer Maryland of the "benefit of

10

the bargain" *it* struck with the claimant homeowners' association. (*Ibid.*) And the court was not going to let that happen.

The later case, *United Services*, arose out of a collision in which the insured was driving a rented car on vacation. An injured passenger sued the insured driver. The rental car insurer admitted it was primary to the insured's regular insurance company, while the insured's regular home-state insurer initially denied coverage entirely. The insured entered into a settlement with the injured passenger, in which the insured agreed to a confession of judgment for $850,000, *but* assigned her rights to any bad faith claims to the injured passenger in return for the passenger's agreement not to execute on the judgment. The rental car insurer – let's now call it the "primary insurer" – paid $200,000 of the $850,000 judgment against the insured, in return for which the passenger released the primary insurer from any further liability to him in his action against the insured. (*United Services, supra*, 94 Cal.App.4th at pp. 642-643.) The primary insurer obviously made a good deal for itself, because it turned out that its limits were $1 million and it had paid out only 20 percent of that. (*Id.* at pp. 642, 646.)

The injured passenger then sued the regular, home-state insurer, asserting breach of contract and bad faith. But while the case was pending, a court ruling in the regular insurer's home state caused it to partially change its mind on the coverage issue, and it then paid $50,000 to the injured passenger. The regular insurer paid $75,000 to settle the bad faith action (alas, it isn't clear from the opinion what was the relationship between the $75,000 and the earlier payment of $50,000) and afterwards the regular insurer sued the rental company insurer for what it paid the injured passenger in the bad faith action, plus the cost of defending that action. The regular insurer prevailed in the trial court on an equitable subrogation theory. (See *United Services, supra*, 94 Cal.App.4th at p. 643.)

But the appellate court reversed. The court reasoned the insured driver had no bad faith claim at all against the rental car insurer – hence no shoes into which the

11

regular insurer could step – because: (1) the rental car insurer *did* defend the insured; (2) it settled within its policy limit; and (3) the insured – and the italics are in the original – "*agreed to the settlement.*" (*United Services, supra*, 94 Cal.App.4th at p. 646.) The last element in particular was stressed by the *United Services* court, in articulating a bright-line rule: "Although we have found no case on point, we conclude that when an insured agrees to an insurer's settlement of a third party claim, *the insured waives any right to maintain a bad faith action against the insurer based on the settlement*, unless the insured's agreement to the settlement was procured by coercion, duress, fraud or some other *improper* means." (*Ibid.* italics added.)

Between *Fireman's v. Maryland 1994* and *United Services*, there is nothing left of XL's equitable subrogation claim. (Well, almost nothing, as we explain in section III.B.c. below.) The parallels to *Fireman's v. Maryland 1994* seem to us inescapable. As here, the primary insurer obtained a release with the third party claimant, the excess insurer initially taking the position it owed nothing because any liability of the insured should be attributed to a time prior to the inception of its policy. As here, the primary insurer's settlement with the third party claimant left the claimant free to assert any bad faith claims held by the insured against the initially nonsettling excess insurer. As here, the excess insurer quickly responded to those assigned claims by settling with the third party claimant rather than fighting it out by asserting its initial coverage position. As here, there is no causation. *And* as here, the excess insurer tried to recoup that payout by litigating against the primary insurer who first settled.

Under such circumstances, it is hard to imagine XL paid $9.3 million out of some concern for the insureds' credit rating, particularly when one realizes that XL cannot – stepping into the *insured's* shoes to assert a claim against St. Paul – even make out a claim for whatever emotional distress might have accompanied a hypothetical decline in their credit ratings. (See Rutter Insurance Treatise, *supra*, ¶ 12:546, p. 12B-77 ["Before taking an assignment of the insured's "bad faith" claim against the insurer, the

12

injured party should consider "the following:  [¶]  • Only the claim for economic damages is assignable (i.e., compensatory contract damages both within and in excess of the policy limits, and any property damage).  The insured's claims for emotional distress and punitive damages are 'nonassignable' . . . ."].)

No, the obvious reason for XL's payment of $9.3 million to the secured creditors – themselves standing in the shoes of the insureds via an assignment of rights against XL – could *only* be XL's own business decision to protect itself from whatever bad faith claims had been transferred from the insureds to the third party claimant.  The payout was not prompted by some wrongful act of St. Paul, the primary insurer (e.g., not settling when it had the chance), but by excess insurer XL's own caution in being unwilling to contribute to the initial settlement of the claims against the insureds, and its subsequent unwillingness to defend *that* decision against whatever bad faith claims it might have engendered.

The parallels to *United Services* are similarly significant.  The three reasons *United Services* gave for disposing of the excess insurer's equitable subrogation claim apply equally here.  One, the primary insurer here defended the insureds at least as much as the primary insurer in *United Services* – in both cases the insured was protected financially from a judgment by the device of a covenant not to execute.  Two, the primary insurer here either (a) settled within its policy limits (if one credits XL's theory that the loss was properly attributable to 2008, with its $15 million limit) or even did better by the insureds than the primary insurer in *United Services*, by paying more than its 2009 $5 million limit.  And, here, as in *United Services*, the insureds expressly released the settling primary insurer, again raising the specter that allowing an equitable subrogation claim against the primary insurer would deprive it of the benefit of its bargain with the insureds.

b. *XL's attempt to distinguish the two cases on point*

XL attempts to distinguish *Fireman's v. Maryland 1994* and *United Services*. Its attempt to distinguish *Fireman's v. Maryland 1994* rests on the assertion that there the excess insurer was a complete "volunteer," because it had no coverage *at all* given that the damages had manifested prior to the inception of its policy, while here XL was looking at some potential for coverage under its 2009 policy.[11]

This attempt rests on fallacious logic. It is a false dichotomy to say that because an insurer might not fit into the mold of "volunteer," a given payment hasn't *necessarily* been made on behalf of its insured as distinct from itself. Insurers make business decisions to settle claims by their insureds all the time, and do so to avoid the risks of litigation itself. In this case, XL was faced with adverse contractual and bad faith claims assigned by its own insureds to a group of unsecured creditors, and its $9.3 million can only be seen as a payment to protect its own interests, not those of its insureds.

XL appears to try to distinguish *United Services* by asserting that the release given by the insureds here was obtained by "improper" means.[12] The theory is that St. Paul somehow "improperly" took the position in negotiations that the insureds' liability should be ascribed to 2009, somehow forcing the insureds to acquiesce to St. Paul's requirement of a release before it would pay off the unsecured creditors and FDIC.

The underlying premise of this argument is that St. Paul's assertion of a coverage position in settlement negotiations was an "improper" act. But this premise is incorrect. Assertion of a legal position in settlement negotiations to resolve claims against insureds already made against them in court is absolutely protected by the

---

[11]    Specifically, XL says the excess insurer's coverage in *Fireman's v. Maryland 1994* "was not fairly implicated," hence the payment of excess insurer Fireman's in that case was truly voluntary, while, says XL, its payment here was not truly voluntary because it was "potential[ly] liable." (App. Opn. Br. at p. 35.)

[12]    Unlike its approach to *Fireman's v. Maryland 1994*, XL does not attempt to formally distinguish *United Services*. It merely cites a federal district court opinion quoting *United Service's* reference to procurement of a release by improper means. (App. Opn. Br. at p. 38.)

14

litigation privilege. (Civ. Code, § 47, subd. (b).) *Home Ins. Co. v. Zurich Ins. Co.* (2002) 96 Cal.App.4th 17 applies a fortiori. There the court held that a misstatement of an insurer's available policy limits in the context of whether a particular driver fell within the category of a permissive user was within the absolute litigation privilege. Here, we have something far more legally debatable, namely a position about the date of inception of a claim.[13]

c. *the new issue of covenants not to execute*

XL raises an issue of first impression previously not addressed in the case law of liability insurance settlements: the effect of the difference between (a) a covenant not to execute an existing judgment and (b) a complete release of liability.[14] XL posits

---

[13] XL makes no argument that St. Paul's attribution of the unsecured creditors' claim was so inherently wrong as a matter of coverage law that St. Paul itself was guilty of bad faith in asserting it – indeed, if it did, XL would be showing itself to be in the *exact* position in which excess insurer Fireman's found itself in *Fireman's v. Maryland 1994.*

*Shafer v. Berger, Kahn, Shafton, Moss, Figler Simon & Gladstone* (2003) 107 Cal.App.4th 54, allowed for an exception to the litigation privilege as regards an attorney in his role as agent for an insurer in a case involving the direct action statute. (Ins. Code, § 11580 [after obtaining judgment against insured, third party judgment creditor may proceed against insured's insurer directly]). In *Shafer*, an insurer's coverage attorney allegedly made a false statement of *fact* regarding an insurer's *business decision* to cover an insured's "willful acts under the policy" despite "occurrence" language in the policy which precluded coverage for willful acts. (*Shafer, supra*, 107 Cal.App.4th at pp. 66, 74-75.) The court treated the statement about the business decision *as* "one of fact" and said the litigation privilege, as construed in *Home*, was inapplicable because the *Home* court did not consider the effect of the direct action statute, hence its construction of the litigation privilege was not applicable to the case before it. (*Id*. at p. 82.)

*Shafer* is clearly distinguishable here. Most obviously, *Shafer* involved an action against the *attorney* for an insurer for fraud based on the attorney's misrepresentation of fact, and the opinion is suffused with umbrage that *an attorney* would make misstatements of *fact* to a statutory third party beneficiary of an insurance contract. (See *Shafer, supra*, 107 Cal.App.4th at pp. 81-82 [quoting Restatement Third on Law Governing Lawyers].) Here, no misstatement of fact is alleged to have been made by St. Paul, only the taking of a coverage position on the conceptually difficult problem of exactly when a claim is made under a claims made policy when, like the present case, a claim is made very late in a policy period. (Cf. *Root v. American Equity Specialty Ins. Co.* (2005) 130 Cal.App.4th 926 [exploring difficulties in ascertaining precisely when insured should have reported claim].)

The conclusion St. Paul was asserting a coverage position, as distinct from a *Shaferesque* statement of fact, is underscored by the irony that at oral argument this court heard from XL's counsel that (a) XL's position in the bankruptcy court was that the claims were all attributable to 2008 while (b) St. Paul's position was that the claims were all attributable to 2009, and then we heard from St. Paul's counsel that (c) the bankruptcy trustee's position (on behalf of the unsecured creditors) was that the claims were attributable to *both* 2008 and 2009. Obviously there was a legal disagreement among the parties, not a factual one.

[14] The Rutter Insurance Treatise specifically notes it is "not clear whether a right to subrogation arises where the insurer pays a claim against an insured who has obtained only a 'covenant not to execute' (protecting the insured's assets but not discharging the insured from liability)." (Rutter Insurance Treatise, *supra*, ¶ 9:48, p. 9-15, citing *Fireman's v. Maryland 1994, supra*, 21 Cal.App.4th at p. 1596, fn. 9. )

15

that by executing only a covenant not to execute, St. Paul left the insureds with a "mess" which XL then stepped in and cleaned up.

While the release obtained by St. Paul is sufficient to cut off *any* right of XL to equitable subrogation – those shoes of the insureds having now been given away to someone else – we address XL's argument because of its significant implications for bad faith law. In a word, it is a *terrible* idea to accord an excess insurer subrogation rights against a settling primary insurer based on the theoretical smidgen of twilight between a covenant not to execute and a complete release.

What XL overlooks is that the device of a primary insurer obtaining a covenant not to execute for its insureds in *return for an assignment of rights against another insurer* can actually provide insureds with *better* liability protection than a complete release. The reason is this: In cases such as this, where insureds face liability potentially in excess of all insurance coverage available (remember that the FDIC's demand alone was for $60 million, $10 million more than all coverage for both 2008 and 2009 combined), the device of facilitating a covenant not to execute in return for an assignment of rights gives insureds a very valuable bargaining chip to use in negotiations with third party claimants. Third party claimants themselves may very well put a *value* on an assignment of rights from insureds, combined with a judgment (even if not collectible from the insureds) in excess of the value they would put on their direct claims against the insureds. After all, judgments are easier to collect when they are against insurers than when they are against individuals. And lawyers for those third party claimants are more likely to relish the prospect of laying out an excess insurers' recalcitrance in abstaining from settlement negotiations than picking through the tedious minutiae of so many loan decisions gone wrong.[15] Bottom line: A primary insurer's

---

[15] A fact impliedly recognized by XL itself in the way it has handled this very matter. Rather than taking on the claims-made-prior-to-the-inception-of-the-policy issue directly by way of defense of the assigned claims of the insureds to the unsecured creditors, it has chosen to litigate against another insurer.

16

facilitation of a settlement in which the insureds allow a judgment to be taken against them and assign their rights against another insurer – even if they only get a covenant not to execute and not a "complete" release – may be the only practical way to effectively protect *all* the insureds' assets.[16]

XL's argument is also incompatible with established equitable subrogation law as it now stands. Under current equitable subrogation doctrine, the party asserting a claim in equitable subrogation (like XL here) must show *superior equities*, such that fairness and justice are served by shifting the *entire* loss to the party against whom (like St. Paul here) the claim is made. But under the superior equities doctrine, any suggestion XL's equities *outweigh* St. Paul's is risible. St. Paul effectively protected the insureds' assets from all liability exposure from the claims of the FDIC and unsecured creditors here. XL protected the insureds' credit ratings and its own liability against the insureds' claims against it.

Moreover, even if the equitable subrogation doctrine were to be modified in the future to allow for partial equitable subrogation,[17] the result would still be the same. The balance of equities is so lopsided that it would be substantively inequitable for XL to recover anything from St. Paul. As *Fireman's v. Maryland 1994* makes clear, any

---

[16]     *Ivy v. Pacific Automobile Ins. Co.* (1958) 156 Cal.App.2d 652, the chief case on which XL relies to argue that St. Paul's incomplete settlement left the insureds with outstanding "collateral" effects is distinguishable because there the insured, being defended by an insurer-appointed defense attorney, was not actually informed of the settlement in which he supposedly agreed to a stipulated judgment against him and received a covenant not to execute from the injured plaintiff. (*Id*. at pp. 654-655.) So it is no wonder he objected when he discovered his credit rating went down. (See *id.* at p. 658.) In the case before us, the insureds themselves knew they were receiving a covenant not to execute as distinct from a complete release and were presumably informed of the residual "collateral" consequences it might entail.

[17]     The "superior equities" doctrine in tort law has come under significant criticism as outdated in light of California's adoption of a regime of comparative – as distinct from all-or-nothing contributory – negligence. The anomaly is not surprising given that the superior equities doctrine was articulated (in a tort context – forged checks) back in 1938, in *Meyers v. Bank of America etc. Assn.* (1938) 11 Cal.2d 92, when all-or-nothing contributory negligence was the operative tort doctrine. (See generally *State Farm General Ins. Co. v. Wells Fargo Bank* (2006) 143 Cal.App.4th 1098.) In particular we note Justice Ruvolo's trenchant criticism of the superior equities doctrine set forth in his concurring opinion in *State Farm v. Wells Fargo N.A.* (See *id*. at pp. 1121-1128 (conc. opn. of Ruvolo, J.) [superior equities doctrine outdated hang over from era of contributory negligence]; see also *Fort Bragg Unified School Dist. v. Colonial American Casualty & Surety Co.* (2011) 194 Cal.App.4th 891, 916 ["In view of the criticism the doctrine has received, and its declining acceptance by the courts, we are especially wary of extending it to a set of facts to which it does not clearly apply."].)

recovery by an excess insurer against the primary insurer under circumstances such as this would wholly undermine the benefit of the bargain obtained by a primary insurer who seeks to buy its peace by funding a settlement with a third party claimant. Allowing even partial recovery by an excess carrier would perniciously create a major disincentive for primary carriers to fund settlements on behalf of their insureds.

And the problems would not stop there. Liability excess insurers would have an incentive to be less circumspect about their decisions to refrain from initial settlement discussions, because they would be backstopped by the possibility of being able to shift later payouts resulting from the assignment of claims against them (including bad faith claims) to primary carriers under the guise of equitable subrogation on the theory at least *a portion* of the payouts somehow benefitted insureds. But, as *United Services* very clearly said, insurers do not get to make other insurers pay for their own costs of fending off the contract and bad faith claims. (*United Services, supra*, 94 Cal.App.4th at p. 645.)

C. *Equitable Indemnity and Contribution*

Some claims, like XL's claim for equitable subrogation, fail in manifold and complex ways. But XL's claim to equitable indemnity and contribution fails in a quite straightforward way: The authorities are uniform that equitable indemnity and contribution arise out of common obligations, and the obligations of a primary and an excess insurer are fundamentally different. If there is no common obligation, there is no payment on the same risk, and there can be no claim for equitable contribution. (*Fireman's v. Maryland 1998, supra*, 65 Cal.App.4th at p. 1294, fn. 4 ["The doctrine of equitable contribution applies to insurers who share the *same* level of obligation on the *same* risk as to the same insured." (Original italics.)]; *Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1078 ["As a general rule, there is no contribution between a primary and an excess carrier."]; Rutter Insurance Treatise, *supra*, ¶ 8.66.2, p. 8-27 ["No equitable contribution between primary and excess insurers:

18

As a general rule, there is no right to equitable contribution between a primary and excess carrier (because they are not on the same level of liability) absent a specific agreement to the contrary."].)

Thus any viable theory by which an excess insurer seeks to recoup its own losses from a primary insurer must necessarily be by equitable subrogation based on the *insured's* rights against the primary insurer, not by equitable contribution on the theory the excess insurer insured the same risk as the primary, because it didn't. (See *Reliance Nat. Indemnity, supra*, 72 Cal.App.4th at p. 1078 ["However, where different insurance carriers cover differing risks and liabilities, they may proceed against each other for reimbursement by subrogation rather than by contribution."].) We will therefore not belabor the point further. XL was an excess insurer not on the same risk as St. Paul.

D. *Unjust Enrichment and Tortious Interference*

We now address the two exotic theories proffered by XL, unjust enrichment (which is currently in the complaint) and tortious interference (which XL says it could amend its complaint to state). Neither theory holds water.

a. *unjust enrichment*

The elements of a claim for unjust enrichment are simple: receipt of a benefit and its unjust retention by the defendant. (*Elder v. Pacific Bell Telephone Co.* (2012) 205 Cal.App.4th 841, 857; *Lectrodryer v. SeoulBank* (2000) 77 Cal.App.4th 723, 726.) XL argues it conferred an advantage on St. Paul which St. Paul unjustly retained. The theory that XL conferred a benefit on St. Paul is predicated on the idea that most or all of the $9.3 million paid by XL under its 2009 policy should have been paid by St. Paul pursuant to its 2008 policy with its $15 million primary limit.

Let's cut to the chase. The "unjust" part of unjust enrichment does not apply to any behavior on St. Paul's part. As alluded to above, St. Paul settled with its insureds, effectively protecting them as much as possible from any monetary consequences attendant upon the claims made against them. What XL now excoriates as

19

the "mess left over," because of a large judgment and the covenant not to execute being supposedly "incomplete," had the objective effect of maximizing the insureds' bargaining power vis-à-vis the third party claimants. A complete release would have definitively wiped out the insureds' potential bad faith claim against XL, thus depriving the insureds of a valuable bargaining chip they had to buy off the claims of the FDIC and unsecured creditors. As *Samson v. Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 240, points out, an "insured breaches no duty to the insurance company when he assigns his rights against the company to the injured plaintiffs in return for a covenant not to execute." Indeed, where the insurer doesn't defend, insureds have, in the absence of fraud, the right to settle with third parties claiming against them "'upon the best terms possible.'" (*Ibid.*) St. Paul here was only helping the insureds maximize their bargaining power.

b. *tortious interference*

XL's tortious interference claim is premised on the idea that St. Paul, by obtaining a release from *its own* insureds, somehow interfered with the provision in XL's policy with the same insureds that they not do anything to impair XL's "right of recovery."[18]

The irony in this argument cannot go unremarked. The provision in XL's policy which it claims St. Paul induced the insured to breach – the "right of recovery provision" – isn't even in XL's policy directly. Any "right of recovery" in XL's excess policy only exists by virtue of XL's incorporation by reference of the terms in *St. Paul's*

_____

18 Policies typically have such provisions. See Rutter Insurance Treatise, *supra*, ¶ 9:26, p. 9-5 [quoting typical right of recovery clause in liability policy].

20

*own* primary policy.[19] Thus XL's breach of contract claim devolves into an effort to hold St. Paul responsible for inducing a breach of a provision in its own policy.

XL's theory reduces to absurdity. It would mean anytime a primary insurer entered into a complete release with its insureds who might, perchance, have other insurers, it would be potentially liable for tortious interference with contract based on the theory the settlement somehow cut off the subrogation rights of some other insurer. This is nonsense. (See *Fireman's v. Maryland 1994, supra*, 21 Cal.App.4th at p. 1598 [noting that excess insurer had no right to deprive primary insurer of the benefit of its bargain in settling with the insured].)

We may also state our conclusion in formal insurance terms: No reasonable insured, in looking at the "subrogation" provision of St. Paul's primary policy incorporated into XL's following form excess policy, would conclude it had anything to do with an excess insurer. Absent absolutely explicit and unambiguous language to the contrary, no insured would ever think it could prevent another from settling a claim with its primary insurer. And no such explicit and unambiguous language is to be found in XL's (really St. Paul's) policy.

---

19    The insuring agreement of XL's excess policy is a "following form" provision: "Coverage hereunder will apply in conformance with the terms, conditions, endorsements and warranties of the Primary Policy together with the terms, conditions, endorsements and warranties of any other Underlying Insurance." The "right of recovery" *in St. Paul's* primary policy appears under the heading "Subrogation" (a fact which XL avoids confronting in its briefing) and provides in its entirety: "In the event of any payment under this Policy, the insurer shall be subrogated to the extent of such payment to all the Insureds' rights of recovery, including the Insured Persons' rights to indemnification or advancement from the Company. The Insureds shall execute all papers required and shall do everything necessary to secure and preserve all rights of recovery, including the execution of such documents necessary to enable the insurer effectively to bring suit in the name of the Insureds."

21

## IV. DISPOSITION

The judgment is affirmed.  St. Paul will recover its costs on appeal.

BEDSWORTH, ACTING P. J.

WE CONCUR:

ARONSON, J.

FYBEL, J.